112 A.2d 844 (1955)
Helen N. MOUGIANIS, Plaintiff,
v.
EMBASSY REALTY COMPANY, a corporation of the State of Delaware and John Diamantopoulos, Defendants.
Court of Chancery of Delaware, New Castle.
April 1, 1955.
*845 James J. Walsh, Wilmington, for plaintiff.
Donald W. Booker, of Coxe, Booker & Walls, Wilmington, for defendants.
MARVEL, Vice Chancellor.
Plaintiff is the wife of Nearchos Mougianis and the sister of Mrs. John Diamantopoulos. Nearchos Mougianis and John Diamantopoulos were for a number of years, prior to the final breakup of their association in the early part of 1954, the proprietors of the Central Restaurant which is situated on Market Street between 8th and 9th Streets in Wilmington. Since June 14, 1951, all of the stock of the defendant corporation has been held in the name of the individual defendant, John Diamantopoulos. On the same date, under circumstances hereinafter described, the corporate defendant and plaintiff became tenants in common of a vacant lot on King Street between 8th and 9th Streets in Wilmington. This lot, a dispute over the use of which has precipitated the present accounting action, has a frontage of approximately twenty-two feet on King Street and a depth of about one hundred feet and is situated immediately to the rear of the Central Restaurant.
The theory of plaintiff's case is that since June 14, 1951, she has had a stake in a business venture to which she contributed her undivided one-half interest in the above described lot. This lot represents an investment of approximately $23,000, paid in equal parts by plaintiff's husband and John Diamantopoulos, title having been taken originally in the name of Embassy Cafe Inc., the former name of the defendant corporation, stock in which was held in equal parts by John Diamantopoulos and plaintiff's husband. Upon the acquisition of all of the corporate stock of the defendant corporation by the individual defendant, the corporate defendant and plaintiff were made tenants in common of the lot. The immediate purpose behind acquisition of the lot was to provide access to the rear of the Central Restaurant, a long term plan, which failed to materialize, having been to add a banquet hall to the restaurant. Immediately to the north of the lot owned by plaintiff and the corporate defendant is another[1] *846 vacant lot with a frontage of approximately forty-eight feet on King Street and a depth of about one hundred feet.
During the period between June 14, 1951, until the early part of 1953, this larger lot, through which is the only entrance for motor vehicles to the lot owned in common by plaintiff and the corporate defendant, was operated as a parking lot by persons having no interest in this litigation. During the period above stated the lot belonging to plaintiff and the corporate defendant was undoubtedly used as an adjunct to the larger lot[2] with at least the tacit approval of the parties to this litigation in return for privileges of access to the rear of the Central Restaurant and of parking in the Friedmann lot. The evidence does not establish in my opinion, however, that the individual defendant holds any moneys due plaintiff for the use of the lot owned in common during this period.
Effective February 1, 1953, John Diamantopoulos primarily to eliminate disputes over rights in the Friedmann lot and to ensure access for deliveries to and garbage removals from the Central Restaurant, leased this larger lot in his own name. At the beginning of the term he hired an attendant to operate the lot at a loss to himself according to the records placed in evidence. Later he sub-leased the area at a daily rental. During the Christmas seasons of 1953 and 1954 the fronts of both lots were used by Wallace H. Willey as a stand for the sale of Christmas greens, and John Diamantopoulos received rent for such use. He also was paid a small annual rental by Hessler Inc. for the privilege of maintaining a bill board on the north end of the Friedmann lot.
Plaintiff contends that having relied on John Diamantopoulos to act for her in a joint enterprise in which she was to share in the profits of both lots she is entitled to an accounting and to be paid a share of the profits of a business operated by the individual defendant allegedly since June 14, 1951, the date plaintiff became a tenant in common of the disputed lot. As indicated above, I find that the individual defendant does not hold any unaccounted moneys realized from the operation of either lot prior to February 1, 1953. While the individual defendant has furnished an account to plaintiff setting forth the income and expenses involved in operating the entire parking lot project since February 1, 1953, he denies any obligation to account to plaintiff in a court of equity.
The testimony concerning the origins of the project in which plaintiff seeks an accounting is in hopeless conflict. Plaintiff and her husband while conceding that there was no written agreement setting forth the mutual obligations of the parties, testified that they had entrusted the operation of the parking lot operation to the individual defendant, a close business associate of plaintiff's husband, and relied on him to give an accounting of his stewardship. The documents having to do with the parking lot project disclose, however, that the lease of the Friedmann lot was entered into by John Diamond[3] as an individual, the account furnished to plaintiff discloses a separate project called "John Diamond Parking Lot", and the actual account book of the project is titled "John's Parking Lot". The individual defendant paid for slag for surfacing the parking area, paid for electricity for the shed occupied by his sub-lessees for a limited period and paid rental to Friedmann and Co., the landlord's agent, for the use of the larger lot. Furthermore, while there is testimony that moneys derived from operation of the parking lot were turned over to employees of the Central Restaurant for delivery to the individual defendant, the evidence does not disclose that the operation of the lot has been connected in any direct financial way with the Central Restaurant since February 1, 1953.[4] Plaintiff contends *847 and the individual defendant denies that the Central Restaurant on at least one occasion paid an annual rental of $1,000 for privileges in the disputed lot. There is no evidence that such payments were made in the years 1953 and 1954. It is significant that in the settlement of the affairs of the Central Restaurant resulting in the withdrawal of Mr. Mougianis from the restaurant business, negotiation of differences concerning operation of the parking lot was specifically excluded. Insofar as the lot held in common was used for deliveries and removals from the Central Restaurant, it benefited both the Mougianis' and Diamantopoulos' interests. Also see footnote No. 6, infra.
I find that the parking lot project was entered into by John Diamantopoulos in an effort to straighten out a difficult situation concerning the use of the area to the rear of the Central Restaurant. It was essential to the restaurant that it have access to its kitchens through the Friedmann lot, inasmuch as delivery trucks could not move from the street without going through the entrance situated on the larger lot. Mr. Mougianis or his wife did not participate in the operation of the Friedmann lot; they paid none of its expenses and should not share in the profits derived from the management of land in which they have no interest. The question remains, however, is the plaintiff entitled to an accounting in moneys derived from the unquestioned use of the smaller parking lot in which she holds an interest as a tenant in common?
It is clearly established by the evidence that from the time plaintiff acquired her undivided interest in the disputed lot it has been used by others. The witnesses, Redding and Porter, felt free to park cars on the lot in which plaintiff holds an interest and there is evidence that such use was carried on after the beginning of February, 1953, with the tacit or express consent of the individual defendant. By the same token neither the plaintiff nor her husband apparently objected to this use by Redding and Porter until the imminence of the present suit led to a fencing off of the disputed area by plaintiff's husband.
At common law a cotenant was not accountable to another cotenant for rents received from third persons. The Statute of 4 and 5 Anne, Chap. 16, gave a cotenant a cause of action under such circumstances. Modern equity cases hold that notwithstanding this remedy at law, there is a concurrent remedy in equity for one tenant in common against his cotenant,[5] Maekotter v. Maekotter, 74 Misc. 214, 131 N.Y. S. 815 and Annotations in 27 A.L.R. p. 184 at page 244 et seq. and 39 A.L.R. p. 408. The relationship of tenants in common to one another is normally a fiduciary one, Leach v. Beattie, 33 Vt. 195. Compare Pan American Trade & Inv. Corp. v. Commercial Metals Co., Del.Ch.1953, 94 A.2d 700.
Applying this principle, I find that plaintiff is entitled to an accounting from her cotenant for rents which the individual defendant has received from third parties for the use of the lot owned in common by the corporate defendant and plaintiff. The individual defendant must, of course, receive proper credit for any taxes and necessary expenses allocable to the smaller lot which he has personally paid.
Pre-trial discovery and evidence introduced at trial disclose a modest profit to the individual defendant from the operation of the entire parking lot project from February 1, 1953 through the year 1954, but *848 plaintiff disputes the accuracy of the figures adduced. Plaintiff with present discovery devices at her disposal and the benefit of a full trial has had ample opportunity to supplement the factual data placed in evidence about the income and expenses involved in "John's Parking Lot" project, and in view of the clear terms of the Friedmann lease, the testimony of the subtenants and the testimony concerning expenses involved in the maintenance of the lots, I see no basis for questioning the accounting data now before the Court.
The witnesses, Redding and Porter, were vague about the details of their sub-rental of the parking lot except as to the amount of rent paid by them to Mr. Diamantopoulos, which was $7 a day, seven days a week during the greater part of their tenancies. During this period the individual defendant paid monthly rental of $150 per month for the use of the Friedmann lot. While it would appear to have been poor business judgment on the part of the individual defendant to have charged only $6 and later $7 for the use of the entire lot, and while the testimony is not entirely clear as to the metes and bounds of the area leased to the sub-tenants, I have resolved doubt as to the area rented in favor of plaintiff. I find that the individual defendant subleased his cotenant's interest in the lot held in common and that she is entitled to an accounting in the profits of the enterprise allocable to her one half undivided interest in the smaller lot. Plaintiff is also entitled to a similar share of the net profits of the Christmas green concession for the years 1953 and 1954, based on her interest in the smaller lot. She has no claim, however, for rental received for maintenance of the Hessler sign, which is located on the Friedmann lot.
Counsel may confer with the Court on a form of order designed to bring about an accounting and paying over to plaintiff of one half of the net rentals collected by the individual defendant from third parties since February 1, 1953, for use of the lot held in common.
NOTES
[1] Owned by the Franet Corporation of Delaware which is not concerned with the pending litigation.
[2] This larger lot will be referred to as the Friedmann lot, Lionel Friedmann and Company being the rental agent for the owner, Franet Corporation.
[3] The name used in business dealings by the defendant, Diamantopoulos.
[4] Evidently real estate taxes on the smaller lot were paid by Central Restaurant but this was merely a means of dividing the burden of such taxes between the Mougianis and Diamantopoulos families.
[5] Such remedy is for rents received from third parties. A cotenant is generally entitled to make personal use of property held in common and is not accountable for such use in the absence of ouster, Annotation in 27 A.L.R. p. 184 at page 190.