**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Date Submitted:    September 3, 2021
Draft Report:      December 8, 2021
Final Report:      January 31, 2022

Richard E. Berl, Jr., Esquire
Hudson, Jones, Jaywork & Fisher, LLC
34382 Carpenter's Way
Suite 3
Lewes, Delaware 199958

Gary Shockley
SBI Number 00139419
Sussex County Correctional Institution
P.O. Box 500
Georgetown, Delaware 19947

RE:   *Melvin Green v. Gary Shockley*
      C.A. No. 2018-0782-PWG

Dear Mr. Berl and Mr. Shockley:

The last stage of a partition proceeding involves the distribution of proceeds

from the sale of the partitioned property.  This dispute centers around co-owners

who were tenants in common, each holding a one-half interest in two pieces of real

property devised to them by one of the co-owners' mother.  One property was the

mother's home, and the other was rental property containing six rental units.  This

decision resolves the issues concerning the distribution of sale proceeds from the

partitioned property, balancing contributions for payments made toward the cost of the properties against rental income received by the co-owners. This is a final report.

## I.  Background[1]

This partition action involves two properties, 32790 Bi-State Boulevard, Laurel, Delaware (the "House Property") and 32715 Bi-State Boulevard, Laurel, Delaware (the "Apartments Property") (collectively, the "Properties"), co-owned in equal shares by Petitioner Melvin Green ("Green") and Respondent Gary Shockley ("Shockley").[2] They inherited the Properties as tenants in common on February 24, 2016, at the death of Margaret R. Taylor ("Decedent"), Shockley's mother.[3]

The House Property was Decedent's residence, and it was subject to a mortgage held by Nationstar Mortgage LLC ("Nationstar").[4] Green lived in the House Property with Decedent and continued to reside there after Decedent's death.[5]

---

[1] I refer to the transcript of the September 1, 2021 hearing in this matter as "Trial Tr." and to Green's trial exhibits as "Pet'r Tr. Ex." and Shockley's trial exhibits as "Resp't Tr. Ex." Certain expenses for the Properties are summarized by category in the Appendix to this report.

[2] *See* Docket Item ("D.I.") 1, ¶¶1-3; *See In re Margaret R. Taylor*, Register of Wills Folio No. 11034 ("ROW Folio"), D.I. 2. Because the Register of Wills ("ROW") is a Clerk of the Court of Chancery, filings with the ROW are subject to judicial notice. See 12 *Del. C.* § 2501; Del. R. Evid. 202(d)(1)(C); *Arot v. Lardani*, 2018 WL 5430297, at *1, n. 6 (Del. Ch. Oct. 29, 2018).

[3] D.I. 1, ¶ 4; *see also* ROW Folio, D.I. 2.

[4] D.I. 1, ¶ 7.

[5] Trial Tr. 119:8-20.

The Apartments Property had five apartments (Apartments A – E) on the premises and a trailer, which were rented out.[6] Green, who collected most of the rental income for the Apartments Property, testified that rent collection was not always consistent.[7] Shockley's brother and agent, Richard Shockley ("Richard"), collected some rental income for the trailer.[8]

Green filed this partition action on October 29, 2018.[9] An initial hearing was held on January 7, 2019 and the matter was stayed for the parties to consider whether to pursue a partition in kind or a private sale.[10] On February 28, 2018, I wrote the parties asking them to submit supplemental evidence regarding whether partition in kind with owelty would be appropriate in this case.[11] Also on February 28, 2019, Shockley filed a response to the petition for partition ("Petition").[12] On April 1, 2018, I advised the parties that partition in kind with owelty was not appropriate in

---

[6] *See* Pet'r Tr. Exs. B, E.

[7] *See* Trial Tr. 14:13-20 (describing Section 8 housing subsidies); *id.* 18:18-24 (describing one tenant who never paid rent); *id.* 21:16-22 (describing another tenant who paid rent irregularly).

[8] *See* n. 46 *infra*. I use first names in pursuit of clarity and intend no familiarity or disrespect.

[9] D.I. 1.

[10] D.I. 8.

[11] D.I. 15.

[12] D.I. 17. Shockley's application to proceed *In Forma Pauperis* was granted on February 28, 2018 on the condition that he would pay fees and costs when the real property was sold. D.I. 18.

this case.[13] On April 24, 2019, I ordered a partition sale and appointed a trustee (the "Trustee") for purposes of completing that sale.[14] On April 29, 2019, Shockley filed a motion for a writ of injunction seeking to have rental monies held in escrow until the partition sale process was completed, which was denied on June 26, 2019.[15]

On October 11, 2019, the Properties were sold at public action.[16] The House Property, which was subject to a paramount mortgage lien, sold for $10,000.00.[17] The Apartments Property sold for $132,000.00 and proceeded to settlement on November 6, 2019.[18] The Trustee made his return of sale on November 8, 2019 to confirm the sale of the Apartments Property.[19] I approved the Trustee's sale of the Apartments Property on November 26, 2019.[20] The sale of the House Property was

---

[13] D.I. 26. I found that, because the parties lacked equity in the House Property and one party would have to pay a large sum to equalize the parties' shares in the Properties, it would be unreasonably burdensome to order partition in kind with owelty and I declined to do so. *Id.*

[14] D.I. 27. Shockley appealed that partition order to the Delaware Supreme Court, which dismissed the appeal on May 24, 2019 for lack of jurisdiction to consider an appeal of a Master's order. D.I. 28; D.I. 32.

[15] D.I. 29; D.I. 33.

[16] D.I. 36, at 3-4.

[17] *Id.*, at 3-5. The principal amount due and owing on the House Property's mortgage held by Nationstar was $160,146.03 at the time the foreclosure action on the mortgage was filed on December 31, 2018. *See Nationstar Mortgage LLC d/b/a Mr. Cooper v. Est. of Margaret R. Taylor*, C.A. No. S18L-12-033 CAK (Del. Super.), D.I. 1.

[18] D.I. 36., at 4-5.

[19] *Id*.

[20] D.I. 37.

4

not completed by the buyer and the Trustee advised that another partition sale would be futile since Nationstar was foreclosing on the House Property's mortgage.[21]

Shockley submitted his proposed decree of distribution on October 24, 2019 and again on December 20, 2019.[22] Green filed his proposed decree of distribution on February 24, 2020.[23] The decree for distribution hearing was delayed due to the COVID-19 pandemic.[24] An evidentiary hearing on the decree for distribution was held on September 1, 2021.[25] The Trustee currently holds $121,781.58 in escrow from the sale of the Properties.[26] I reserved my decision following the evidentiary

---

[21] The Trustee notified the Court on February 6, 2020 that the buyer no longer wished to purchase the House Property and forfeited the $10,000.00 deposit. D.I. 44. The Trustee also stated that the House Property would go to sheriff's sale in the foreclosure action. *Id.* The House Property was sold in a sheriff's sale on August 17, 2021. *See Nationstar Mortgage LLC d/b/a Mr. Cooper v. Est. of Margaret R. Taylor*, C.A. No. S18L-12-033 CAK (Del. Super.), D.I. 21.

[22] D.I. 25; D.I. 41. In his Response to the Petition, Shockley advanced several counterclaims arguing that Green had breached some fiduciary duty as either a co-tenant or as the executor of Decedent's Estate (the "Estate"). *See* D.I. 17; D.I. 29. He did not pursue these counterclaims at trial, but the relief he requested in these counterclaims is largely addressed in the contribution and accounting analysis contained in this report. To the extent that Shockley's claims sought relief related to the administration of, or distributions from, the Estate, those claims should have been raised in exceptions to the accounting or the inventory filed with the Register of Wills. *See* 12 *Del. C.* § 2302(d). Regardless, the counterclaims for breach of fiduciary duty were not addressed or proven at trial.

[23] D.I. 45.

[24] *See* D.I. 53.

[25] D.I. 68.

[26] D.I. 69.

hearing and issued my draft report on December 8, 2021.[27]  Green took exceptions

to my draft report,[28] which have been fully briefed.[29]  I reviewed the exceptions and

believe that they, for the most part, repeat arguments that were adequately addressed

in the draft report.  Where appropriate, I have addressed the exceptions in this report

and made other minor changes.  This is my final report.

## II.    Analysis

### A.    *Ownership Interests of the Parties*

Green seeks a distribution of 60% of the sale proceeds for himself and 40%

for Shockley, arguing that he "was completely responsible for oversight, repair, and

maintenance of the properties."[30]  Shockley asks for contributions for his share of

the rental income retained by Green, as well as rent representing Green's exclusive

use of the House Property.[31]

The Last Will and Testament of Margaret R. Taylor (the "Will") devised the

Properties to Green and Shockley as tenants in common, giving each a one-half

ownership interest in the Properties.[32] "Tenants in common of the legal title to land

---

[27] D.I. 71.

[28] D.I. 72.

[29] D.I. 75; D.I. 78; D.I. 79.

[30] D.I. 45, at 5.

[31] D.I. 41, at 6.

[32] ROW Folio, D.I. 2, at 2.  The Inventory filed by Green as executor shows that Green and Shockley each own a one-half interest in the Properties. *Id.*, D.I. 7, at 2.

6

are ordinarily entitled to the use, benefit and possession of such land."[33] In addition to those rights, the tenant in common takes on certain duties with respect to the property in which they have an undivided interest. While Green argues that an uneven distribution scheme is equitable because of the services he provided to the Properties, I find no evidence to rebut the principle that equity compels an equal division based upon each co-tenant's ownership interest. Therefore, I will split the proceeds on an equal basis between the parties, subject to specific contributions and offsets.

     *B.     Claim for Rental Value Benefit Against Green for the House Property*

Shockley seeks an offset for the fair rental value of the House Property during the period in which he alleges Green had exclusive possession of the House Property.[34] "[E]ach co-tenant is entitled to the possession of the property, [and] the mere fact that one is in possession and the other is not 'does not presumptively show an ouster.'"[35] "A cotenant is generally entitled to make personal use of the property held in common and is not accountable for such use in the absence of ouster."[36] And,

---

[33] *Garber v. Whittaker*, 174 A. 34, 37 (Del. Super. 1934).

[34] D.I. 41, at 6.

[35] *Smith v. Lemp,* 63 A.2d 169, 170 (Del. Ch. 1949) (citations omitted); *see also Knight v. Knight* 89 A. 595, 596 (Del. Ch. 1914).

[36] *In re Estate of Gedling,* 2000 WL 567879, at *7 (Del. Ch. Feb. 29, 2000) (citations omitted).

a co-owner residing in the jointly owned property has no obligation to pay rent unless the co-owners agreed that rent would be paid.[37] "However, if a co-tenant has exclusive possession of the property and ousts other co-tenants, then the rental value (representing the benefit received by the co-tenant having exclusive possession) may be set off against their share of the sale proceeds."[38]

In this case, there is no evidence that Green agreed to pay rent. And, there is not sufficient evidence that Green had exclusive possession of the House Property or that he ousted Shockley. Although Shockley did not access the House Property, Richard, his agent, had access to the House Property.[39] And, there is no evidence that Richard was ever excluded from accessing the House Property by Green. Indeed, the evidence suggests that Shockley believed he had the ability to control the House Property – he sent Green a letter on or about June of 2018 stating that Richard will move into the House Property when Green left.[40] Green testified that,

---

[37] *Id.*, at *13 ("As a co-owner, she has no obligation to pay rent."); *see also In re Real Estate of Hunsucker* ["*Hunsucker*"], 2019 WL 1984242, at *3 (Del. Ch. May 3, 2019); *In re Smith's Estate*, 93 A.2d 314, 316 (Del. Orphans' Ct. 1952) ("Upon what theory, then, is [the cotenant] liable to account for the fair rental value of the remaining one-half of the premises? The only possible basis for a duty to account under the facts here presented would be that the [other cotenants] were excluded from possession.").

[38] *Ponder v. Willey*, 2020 WL 6735715, at *3 (Del. Ch. Nov. 17, 2020), *adopted* 2020 WL 7043627 (Del. Ch. Nov. 30, 2020).

[39] Shockley has been incarcerated since before Decedent's death so he did not have the opportunity to access the Property. However, Richard, who acted on Shockley's behalf on various occasions, testified that he visited Green on the Property. Trial Tr. 104:10-105:3.

[40] Resp't Tr. Ex. D.

after he moved to Virginia, he did not seek tenants for the House Property because Shockley told him Richard was moving in.[41] Thus, Shockley has not shown exclusive possession by Green and I decline to offset the fair rental value of the House Property against Green for the period in which he resided in the House Property.[42]

### C. Rental Income from the Apartments Property

Shockley requests that the distribution reflect an accounting for the rental income that Green received from the Apartments Property.[43] A cotenant "is entitled to an accounting from her cotenants for rents which [another cotenant] has received from third parties for the use of the lot owned in common."[44] At trial, Green showed that he collected $47,215.50 in rent on the Apartments Property between November

---

[41] *See* Trial Tr. 119:17-22; *id.* 120:14-21.

[42] The parties dispute when Green resided in the House Property, with Green claiming he moved out in February of 2018, and Shockley arguing that Green still used the House Property as his residence until October of 2018. *See* Trial Tr. 25:20; *id.* 119:17-22; *id.* 68:2-18. However, since I find no ouster has been shown, I do not need to determine the exact timing of Green's move from the House Property.

[43] D.I. 41, at 3-5.

[44] *Mougianis v. Embassy Realty Co.*, 112 A.2d 844, 847 (Del. Ch. 1955).

of 2017 and November of 2019.[45] In addition, the evidence shows that Shockley's

agent, Richard, collected $5,200.00 in rent for the Apartments Property.[46]

Green and Shockley disagree on the period during which the rental income

should be accounted for. Shockley argues that the rental income accrues to both co-

tenants beginning at Decedent's death in February of 2016.[47] Green asserts that

---

[45] *See* Trial Tr. 14:1-15:3. Green affirmed that his Trial Exhibit B was an accurate reflection of the amount of rent collected during that period. *Id.* Shockley disputed the accuracy of Green's statement, arguing that Green underrepresented rents collected, including for Apartments C, D and E. *See id.* 65:6-8; 74:3-76:24. But, Shockley failed to present proof that Green collected any rental income other than what was reported on Trial Exhibit B. The only tenant to testify about rental payments was Margie Joseph ("Joseph"), who testified that she paid rent on the trailer at the Apartments Property to Richard. *See* Trial Tr. 112:10-17; *id.* 115:21-116:9. Shockley provided a copy of a lease for Apartment C between Green and Matthew Joseph ("Matthew") which listed the rent as $650.00 per month beginning on August 19, 2018. Resp't Tr. Ex. F. He also provided the notice, dated October 15, 2018, stating that Matthew was delinquent in paying $1035.00 in rent. *Id.* That evidence does not prove that Matthew provided rent to Green, considering that the claimed delinquency amount was similar to the amount that would have been due for Matthew's two months under the lease. Shockley further claims that he should receive his share of rental income collected by Green for November of 2019 that was deducted from the Apartments Property's sale proceeds. Trial Tr. 62:15-21. The November of 2019 rent collections are included in rental income calculated in Green's Trial Exhibit B. Pet'r Tr. Ex. B.

[46] Shockley testified that Richard collected $4,400.00 in rent for the Apartments Property. *See* Trial Tr. 78:10-11. Richard testified that he collected $400.00 in rent from Joseph but didn't know for what time period, saying "probably less than a year." *Id.* 104:6-9. Joseph testified that she gave Richard $400 per month for 13 months (from September 2018 to September 2019), which equals $5,200.00 in rent for the trailer. *See id.* 112:6-17; *id.* 114:10-12. Green asserts that Richard also collected rental fees for Apartment C but provided no proof of that claim. *See* Pet'r Tr. Ex. E. Richard denies Green's claim and testified he only received rental monies for the trailer. Trial Tr. 101:19-21; *id.* 102:4-12. Weighing this conflicting testimony, I rely on the most specific and credible testimony and determine that Richard collected $5,200.00 in rent for the trailer.

[47] *See* Trial Tr. 63:9-64:3.

Decedent's estate (the "Estate") managed the Apartments Property prior to its closing and that by failing to object to the Estate accountings, Shockley cannot now seek an accounting of those transactions.[48]

I consider the rental income for the Apartments Property beginning from Decedent's death in February of 2016. Delaware law is well settled that beneficiaries take real property interests under a will "immediately upon the death of the testator subject to be divested if it be necessary to sell it for the payment of debts of the deceased."[49] Thus, Green and Shockley became tenants in common with respect to the Properties immediately upon Decedent's death. The rental income from the Apartments Property accrued not to the Estate but to Green and Shockley as tenants in common.

Green testified that the attorney for the Estate handled the rental income and payment of expenses for the Apartments Property during the estate administration.[50] Despite that claim, however, the Estate's First and Final Account filed with the Register of Wills shows no income or expenses of the Estate beyond administrative

---

[48] *See id.* 126:3-19.

[49] *In re Est. of Bernstein*, 17 A.3d 1172, 1176, n. 10 (Del. Ch. 2011) (quoting *In re Harris' Est.*, 44 A.2d 18, 19 (Del. Orphans' Ct. 1945)) (internal quotation marks omitted).

[50] *See* Trial Tr. 13:7-10; *id.*, at 38:11-39:11.

expenses of the Estate and attorneys' fees.[51]  Under Delaware law, if an estate collects rents and profits of the decedent's real estate, the executor or administrator must account for those rents and profits as assets of the estate.[52]  Because the First and Final Account did not list rents and profits from the Properties, rents and profits were not treated as estate assets.  Further, because the First and Final Account failed to address the income or expenses pertaining to the Apartments Property, it would not have put Shockley on notice to object to the Estate's handling of those matters.  Accordingly, I conclude that Shockley's failure to object to the First and Final Account does not foreclose looking at rental income that accrued between March of 2016 and October of 2017.[53]

---

[51] ROW Folio, D.I. 20.  The First and Final Account was signed by Green as "just and true to the best of [his] knowledge and belief," under penalty of perjury. *Id*.

[52] *See* 12 *Del. C.* §§ 1902, 2301.

[53] In his exceptions, Green argues that consideration of the period from Decedent's death in February 2016 to the Estate's closing in October 2017 in the partition action is barred by 12 *Del. C.* §2302(d), and an improper collateral attack on a determination made by the ROW and this Court in approving the accounting. D.I. 75, at 6-10.  Shockley argues that Green's position at trial is contrary to the position he took before the ROW. D.I. 78, at 3.

A beneficiary of an estate must file exceptions in writing with the ROW within three months of the filing of an account. 12 *Del. C.* § 2302(d).  However, this does not bar claims regarding funds that are not assets of an estate. *See generally Est. of Simmons*, 2016 WL 590373, at *5 (Del. Ch. Feb. 11, 2016).  Here, the First and Final Account, to which Green averred its accuracy, and the accompanying documentation, show that the Estate received no income during its administration. ROW Folio, D.I. 20; *id.*, Acct. Proofs.  Had Green collected the rental income from the Apartments Property on behalf of the Estate, that income would have become an asset of the Estate, and Green would have accounted for it in the First and Final Account. *See* 12 *Del. C.* §§ 1902(a); 2301(a); *see also Harman v. Eastburn*, 76 A.2d 315 (Del. Ch. 1950).  Because Green did not account for it as an Estate

asset, the rental income was not an Estate asset, and it may be subject to these claims in partition.

Green also contends that the approved First and Final Account serves as a judicial determination that the rental proceeds from the Apartments Property were Estate assets, which cannot be subject to a collateral attack. D.I. 75, at 8-10; D.I. 79, at 4-5. "A collateral attack is an attempt to 'avoid, defeat, evade, or deny the force and effect of a final order or judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial.'" *In re Vale*, 2015 WL 721038, at \*4 (Del. Ch. Feb. 19, 2015) (citations omitted). The Court of Chancery, through the ROW, supervises the administration of decedent's estates and approves the accountings. *See* 12 *Del. C.* § 2301; *In re Webb's Est.*, 269 A.2d 413 (Del. Ch. 1970). "Accounts passed by an administrator before the [ROW] are final and conclusive, unless excepted to and carried into the [Court of Chancery], in the due course of such appellate proceedings, wherein alone they can be questioned." *State v. Barnett*, 42 A. 420, 421 (Del. Super. 1895). Here, the First and Final Account shows that the Estate received no income during its administration, and I will not revisit that determination. Shockley's rent claims do not constitute an improper collateral attack on a final judgment, or an "appeal" of, or an attempt to modify, the First and Final Account, since the Apartments Property's rental income was not addressed in that accounting. Instead, Green's obligation to account for the rental income in this partition action stems from his co-tenancy with Shockley of the Apartments Property. *See supra* note 44 and accompanying text. I do not find the cases cited by Green in support of his argument persuasive. D.I. 75, at 8-9. He cites *Gulf LNG Energy, LLC v. Eni USA Gas Mktg. LLC*, but, unlike the situation here, the claims at issue in that case were, in effect, an "appeal" of a final arbitration award and time-barred. 242 A.3d 575, 590 (Del. 2020), *cert. denied*, 142 S. Ct. 76 (2021). Therefore, rental income that was not included in the Estate is appropriately considered in this partition action.

In his exceptions, Green also asserts that Shockley had actual knowledge that the Estate was handling the rental proceeds from the Apartments Property between Decedent's death and October of 2017, despite Green's failure to account for the rental proceeds in the First and Final Account. D.I. 75, at 4-5, 7-8 (citing D.I. 29, Aff.). Green argues that Shockley's correspondence with Green's then-attorney constitutes an acknowledgement by Shockley that the Estate was collecting the rental income from the Apartments Property. Shockley averred that he "acknowledged to [Green's then-attorney his] desire to retain ownership of the properties … Mr. Green would collect the rents." D.I. 29, Aff., ¶ 4. Shockley's communications reveal that he considered himself at that time to be a "co-tenant" with Green regarding the House Property and the Apartments Property. *Id.*; *see also* Resp't Tr. Ex. B (letter from Green's then-attorney to Shockley indicating that Shockley owns a 50% interest in the House Property). Thus, this affidavit does not show that Shockley knew the Estate was handling the rental proceeds.

However, no evidence was provided concerning the exact amounts of rent collected for the period between Decedent's death and October of 2017.[54] Shockley asks the Court to presume that the Apartments Property was fully rented and all rents due were collected during that period.[55] This would be inequitable. Trial testimony shows that the Apartments Property's rental units went through periods of partial vacancy, and that rent collection did not always occur.[56] I find the most equitable means of setting the rental income between March of 2016 and October of 2017 is to estimate the rent collection during that period by averaging the actual monthly collection from November of 2017 through November of 2019.[57]

---

[54] *See* Pet'r Tr. Ex. B.

[55] *See* Trial Tr. 65:5-10.

[56] *See e.g., id.* 18:18-24 (describing one tenant who never paid rent); *id.* 21:16-22 (describing another tenant who paid rent irregularly); *see also id.* 39:12-22 (Green's testimony that the rents collected during the period of the estate were "[b]asically, about the same thing" as the rents collected after the estate was closed).

[57] In his exceptions, Green contends that this analysis is "speculative." D.I. 75, at 9. Green testified that he collected the rents from the Apartments Property from Decedent's death until November of 2017, and that the rents collected from the Apartments Property during that time were "[b]asically, about the same thing" as from November of 2017 to November of 2019. Trial Tr. 37:5-7; *id.* 39:20. Green also testified that he "didn't have" the records of rental collection from Decedent's death until November of 2017. *Id.* 43:24-44:1. Because evidence of rental income accrued between Decedent's death and October of 2017 was not presented at trial but trial testimony established that Green collected the rents during that period at a similar rate, I find using an average of proven monthly rents collected between November of 2017 and November of 2019 to calculate rental income during the earlier period is the most equitable means to resolve this issue.

Combining the amount of rent Green collected ($47,215.50) and the amount that Shockley collected ($5,200.00), from November of 2017 to November of 2019, the Apartments Property generated $52,415.50 in revenue. On a monthly basis, this averages to $2,096.62 per month over the 25-month period. Using the monthly average over the additional 20-month period, the Apartments Property generated an estimated $41,932.40 in revenue from March of 2016 to October of 2017. In total from March of 2016 to November of 2019, the Apartments Property generated an estimated $94,347.90 in revenue. Green and Shockley are each entitled to $47,173.95, representing one half of the total revenue, less contributions or expenses paid.

Green realized approximately $87,447.40 of this revenue.[58] Shockley realized $6,900.50 of this revenue.[59] To make both these numbers equal $47,173.95,[60] Shockley must receive an additional $40,273.45 from the partition proceeds, and Green's share must be reduced by $40,273.45.

---

[58] Green testified that he was collecting rents from the Apartments Property during the period in which the Estate was open. *See* Trial Tr. 37:5-7. Therefore, I impute to him all the revenues collected during that period by adding $47,215.50 (November of 2017 – November of 2019) and $41,932.40 (March of 2016 – October of 2017) and subtracting his payments to Shockley (totaling $1,700.50).

[59] I calculate this by adding to the $5,200.00 collected by Richard: (1) $710.00 that Green transferred to Shockley's account; and (2) $990.50 in checks that Green sent to Richard. *See* Pet'r Tr. Ex. D.

[60] $47,173.95 is one-half of the total estimated rental revenue of $94,347.90.

> ### D. Contributions for Mortgage and Tax Expenses

Green seeks contribution from Shockley for $9,022.59 in mortgage payments and $297.15 in property taxes.[61] Shockley claims contribution from Green for $200.00 he paid in property taxes.[62]

"[A] cotenant not in possession also has a duty to contribute to the cotenant in possession as to any payments on a mortgage or for taxes."[63] The party claiming contributions for taxes, repairs, or other costs has the burden of proof.[64]

Here, I find there is sufficient evidence to show that Green made $7,153.73 in mortgage payments on the House Property.[65] Green, however, provided no proof of making the $297.15 property tax payment and I decline to include it in his contributions. Although Green testified that he paid income taxes on the rental

---

[61] *See* Pet'r Tr. Ex. D.

[62] Resp't Tr. Ex. O.

[63] *Haygood v. Parker*, 2013 WL 1805602, at *3 (Del. Ch. Apr. 30, 2013) (citing *Carradin v. Carradin*, 1980 WL 268076, at *2 (Del. Ch. Sept. 22, 1980)); *see also Est. of Weber v. Weber* ["*Weber*"], 2014 WL 589714, at *5 (Del. Ch. Feb. 17, 2014) ("Delaware law requires cotenants to share equally the taxes imposed on jointly-owned property and insurance costs associated with the property, even when one cotenant has exclusive possession of the property.") (citations omitted); *In re Real Estate of Turulski*, 1993 WL 18767, at *5 (Del. Ch. Jan. 21, 1993) (co-tenant is reimbursed for payments on taxes related to partition sale proceeds distribution).

[64] *Weber*, 2014 WL 589714, at *5-6 (denying contribution claims because the cotenant "provided no justification" for the claimed figures).

[65] Pet'r Tr. Ex. D; *see* App., Table 1.

income from the Apartments Property,[66] I discount that claim because Green did not provide proof that he paid income taxes or the amount of taxes paid. I find Shockley has provided sufficient proof that he paid $200.00 in property taxes.

Additionally, as I have imputed rental income to Green for the period between Decedent's death and October of 2017, I will impute to Green and Shockley the mortgage and taxes expenses for this period. Combining the amount of expenses Green incurred ($7,153.73) and the amount that Shockley incurred ($200.00), from November of 2017 to November of 2019, $7,353.73 in mortgage and taxes expenses was expended on the two properties. On a monthly basis, this averages to $294.15 per month over the 25-month period. Of this, Green contributed an approximate $286.15 per month, and Shockley contributed approximately $8.00 per month. Using the monthly averages over the additional 20-month period, an additional estimated $5,883.00 in mortgage and taxes expenses from March of 2016 to October of 2017, of which Green incurred $5,723.00 and Shockley incurred $160.00. In total from March of 2016 to November of 2019, the co-tenants incurred $13,236.73 in mortgage and taxes expenses.

In total, Green incurred an estimated $12,876.73 in mortgage and taxes expenses, and Shockley incurred an estimated $360.00 in mortgage and taxes

---

[66] *See* Trial Tr. 28:6-18.

expenses. For both co-tenant's share of the mortgage and taxes expenses to equal $6,618.36,[67] Green will receive an additional $6,258.36 from the partition proceeds, and Shockley's share will be reduced by $6,258.36.

### E. Contributions for Utilities, Repairs, and Maintenance

As part of the rental of the Apartments Property, Green incurred various expenses related to common utilities, repairs, and maintenance in the course of the rental agreements.[68] Green claims (1) $3,170.60 in utility costs, (2) $5,176.84 in the costs of repair supplies and skilled repairmen, and (3) $21,295.00 for his own labor in maintenance and expenses.[69] Shockley opposes this request to the extent that maintenance expenses were not approved by agreement between the two co-tenants or that Green cannot prove the expenses.[70]

If proven,[71] payments for repairs may be allowed pursuant to an agreement or consent between the cotenants.[72] Additionally, the Court may consider such

---

[67] $6,618.36 is one-half of the total estimated mortgage and taxes expenses of $13,236.73.

[68] *See* Trial Tr. 31:2-36:19.

[69] *See* Pet'r Tr. Ex. D.

[70] *See* Trial Tr. 68:23-69:14; *id.* 71:2-72:16.

[71] *See Weber*, 2014 WL 589714, at *5-6 (Del. Ch. Feb. 17, 2014). The parties each have the burden of providing sufficient proof of their claimed contributions, including cancelled checks or receipts, to show that the expenses or damages claimed are proven to a reasonable certainty and are not speculative or conjectural. *See generally H & H Brand Farms, Inc. v. Simpler*, 1994 WL 374308, at *5 (Del. Ch. June 10, 1994).

[72] *Haygood v. Parker*, 2013 WL 1805602, at *5 (Del. Ch. Apr. 30, 2013) (citing *In re McCaffrey*, 1995 WL 37794, at *1 (Del. Ch. May 31, 1995)).

expenses as an offset to rental income,[73] and the Court may, as a matter of equity,

compensate a co-tenant proportionally out of sale proceeds in a partition for

improvements made by one co-tenant if "those improvements have enhanced the

value of the property."[74]

Here, there is evidence that Green and Shockley agreed to share the reasonable

costs of renting the Apartments Property.[75] I allow Green's proven expenses because

they were incurred in the course of renting the Apartments Property, which

benefitted both co-tenants. I find that Green has provided proof that he paid

$1,906.23 in utility costs[76] and $4,368.09 for repairs[77] to the Apartments Property,

---

[73] *Cf. Hunsucker*, 2019 WL 1984242, at *2 (Del. Ch. May 3, 2019) (declining under the facts of the case to consider rental income and expenses because the parties had previously divided the income and costs of the two apartments on the partitioned property).

[74] *Weber*, 2014 WL 589714, at *5. To be entitled to contribution from sale proceeds, a co-tenant must show that the other co-tenant agreed to the repairs or that improvements enhanced the property's value. *Id*.

[75] *See* Pet'r Tr. Ex. C (letter from Shockley directing Green to "let Richard know of any repairs being done" and for Richard "to agree on any moneys [sic] being spent on [the Properties]"; D.I. 49, Ex. B (letter from Shockley to Green suggesting an agreement for an even split of repair expenses).

[76] Payments for a trash dumpster for the Apartments Property, in the amount of $1,432.90, and $473.33 for electricity to power the water pump for the rental units, make up the proven utility expenses paid by Green. *See* Pet'r Tr. Ex. D; App., Table 2; Trial Tr. 31:2-32:5; *id.* 48:11-20.

[77] Proven repair costs include Green's documented payments for repair supplies and for plumbing-related repairs and the septic system. *See* Pet'r Tr. Ex. D; App., Table 3. Green testified that the Apartments Property had persistent issues with its plumbing and septic systems that required the pumping of its holding tank on a regular basis. Trial Tr. 35:2-36:4. The proven repair supplies were determined by matching receipts and credit card statements in Green's Trial Exhibit D with his claimed list of expenses in that exhibit. *See*

19

for a total of $6,274.32. This reflects expenditures sufficiently documented by Green through receipts submitted as evidence at trial.[78] I decline to award Green his claimed labor and maintenance expenses. Green claims approximately $400 per month in "Maintenance" costs and additional "Labor" costs.[79] Green testified that these expenses reflect his own labor,[80] but he failed to provide any detail on the tasks he performed, how long those tasks took, or the fair market value of his services.[81] Green, thus, "has provided no justification for the … figure[s he] assigns to [his] 'labor' costs."[82]

In addition, since I have imputed rental income for the Apartments Property for the period between March of 2016 and October of 2017, it is equitable that I similarly account for repair and utility costs for that period. Green incurred $6,274.32 in repair and utility expenses from November of 2017 to November of 2019. On a monthly basis, this averages to $250.97 per month over the 25-month

---

Pet'r Tr. Ex. D. If Green did not provide payment documentation, I did not consider the expense on Green's list as proven.

[78] *See* Pet'r Tr. Ex. D.

[79] *Id.* Green also claims $300.00 for time spent in court appearances in October and November of 2019 but provided no detail on those expenses. *Id.* He also provided a copy of a $40.00 check to JP Court dated July 20, 2018 but did not provide documentation to show the check was associated with a court action for the Apartments Property. *Id.* Since I find those expenses are not supported by sufficient documentation, I do not include them.

[80] *See* Trial Tr. 33:13-34:12.

[81] Pet'r Tr. Ex. D.

[82] *Weber*, 2014 WL 589714, at *6 (Del. Ch. Feb. 17, 2014).

period. Using the monthly average over the additional 20-month period, Green incurred an estimated $5,019.40 in repair and utility expenses from March of 2016 to October of 2017.

In total from March of 2016 to November of 2019, Green incurred an estimated $11,293.72 in utility and repair expenses. To assess equal utility and repair expenses to both co-tenants ($5,646.86),[83] Green will receive an additional $5,646.86 from the partition proceeds, and Shockley's share will be reduced by $5,646.86.

### F.    Attorneys' Fees

Green requests contribution for $2,053.00 in attorneys' fees.[84] Shockley disputes this request, arguing that Green is responsible for his own attorneys' fees in this matter.[85] "Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[86] Equitable exceptions to the American Rule include the bad faith

---

[83] $5,646.86 is one-half of the total estimated utility and repair expenses of $11,293.72.

[84] *See* Pet. Tr. Ex. D.

[85] *See* Trial Tr. 73:20-24.

[86] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017); *see also Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014).

exception,[87] and the "common benefit doctrine."[88] Here, I find no basis to shift Green's attorneys' fees and costs to Shockley. There is no evidence of bad faith conduct on the part of Shockley, or that Green's efforts to partition the Properties produced a benefit that would not otherwise have existed.[89] Therefore, Green's claim for attorneys' fees is denied, and he must bear his own attorneys' fees and costs.

### G. Court Costs to be Paid by Shockley

On February 28, 2019, I granted Shockley's *In Forma Pauperis* application with the condition that Shockley would "[p]ay fees and court costs upon the condition that the real property is sold."[90] The Register in Chancery has calculated that Shockley's fees and court costs related to this case as of the time of the draft

---

[87] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

[88] "The common benefit doctrine . . . is designed to equitably spread the costs of producing a benefit realized by a group, which benefit, absent the Plaintiff's efforts, *would not exist.*" *Moore v. Davis*, 2011 WL 3890534, at *2 (Del. Ch. Aug. 29, 2011).

[89] Courts have found that partition sales result "in the co-tenants exchanging an asset of equal value, i.e., the co-tenants exchange an undivided fractional ownership in the property for a corresponding fractional interest in the net value of the property upon sale. The result is a wash and, therefore, no benefit to the group results from a petitioner's actions in a typical partition case." *Estate of Proffitt v. Miles*, 2012 WL 3542202, at *2 (Del. Ch. Aug. 4, 2012); *see also Moore*, 2011 WL 3890534, at *2.

[90] D.I. 18.

report total $1,808.50.[91] Pursuant to the February 28, 2019 Order, the Trustee will be directed to disburse $1,808.50 from Shockley's share of the partition proceeds to the Register in Chancery.

## III. Conclusion

For the reasons set forth above, I recommend that the Court direct that the remaining sale proceeds in the amount of $121,781.58 be distributed by the Trustee as follows: $32,522.56 to Green,[92] $87,450.52 to Shockley,[93] and $1,808.50 to the Register in Chancery. This is a final report, and exceptions may be taken under Court of Chancery Rule 144.

Sincerely,

*/s/ Patricia W. Griffin*

Master in Chancery

---

[91] In the interest of efficiency and recognizing that additional costs would be minimal, I limit the court costs to the amount due when the draft report was filed.

[92] I reach this figure by taking $60,890.79 (one half of the proceeds held by the Trustee), subtracting $40,273.45 (representing the excess rental revenue Green received), adding $6,258.36 (representing Green's excess contribution to mortgage and taxes), and adding $5,646.86 (representing Green's contribution to repair and utility expenses).

[93] This figure is calculated by taking $60,890.79 (one half of the proceeds held by the Trustee), adding $40,273.45 (representing the excess rental revenue Green received), subtracting $6,258.36 (representing Green's excess contribution to mortgage and taxes), subtracting $5,646.86 (representing Green's contribution to repair and utility expenses), and subtracting $1,808.50 (representing Shockley's court costs to be paid to the Register in Chancery).

# Appendix: Green's Proved Expenses

## TABLE 1: Mortgage Payments

| Date | Paid To | Amount | Citation |
|---|---|---|---|
| 12/08/2017 | WEB PMT MR COOPER | $1,316.00 | Pet. Tr. Ex. D, at 9 |
| 02/22/2018 | WEB PMT MR COOPER | $2,000.00 | Pet. Tr. Ex. D, at 28 |
| 03/12/2018 | Nationstar dba RETRY PYMT | $1,737.73 | Pet. Tr. Ex. D, at 32 |
| 06/06/2018 | WEB PMT MR COOPER | $1,400.00 | Pet. Tr. Ex. D, at 34 |
| 07/10/2018 | WEB PMT MR COOPER | $700.00 | Pet. Tr. Ex. D, at 42 |
|  | **TOTAL** | $7,153.73 |  |

## TABLE 2: Utility Costs to the Apartments Property

| Date | Paid To | Amount | Citation |
|---|---|---|---|
| 11/10/2017 | Water Pump | $18.17 | Pet. Tr. Ex. D, 81 |
| 11/17/2017 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 8 |
| 12/11/2018 | Water Pump | $18.71 | Pet. Tr. Ex. D, 81 |
| 01/09/2018 | Water Pump | $18.56 | Pet. Tr. Ex. D, 81 |
| 02/12/2018 | Water Pump | $37.20 | Pet. Tr. Ex. D, 81 |
| 03/14/2018 | Water Pump | $28.93 | Pet. Tr. Ex. D, 81 |
| 03/27/2018 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 21 |
| 02/08/2018 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 30 |
| 04/11/2018 | Water Pump | $18.43 | Pet. Tr. Ex. D, 81 |
| 04/24/2018 | Chesapeake Waste | $72.90 | Pet. Tr. Ex. D, 36 |

| | | | |
|---|---|---|---|
| 04/24/2018 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 36 |
| 05/11/2018 | Water Pump | $18.51 | Pet. Tr. Ex. D, 81 |
| 06/11/2018 | Water Pump | $18.49 | Pet. Tr. Ex. D, 81 |
| 07/12/2018 | Water Pump | $18.57 | Pet. Tr. Ex. D, 81 |
| 07/31/2018 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 46 |
| 08/13/2018 | Water Pump | $18.35 | Pet. Tr. Ex. D, 81 |
| 09/11/2018 | Water Pump | $18.20 | Pet. Tr. Ex. D, 81 |
| 09/18/2018 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 50 |
| 10/12/2018 | Water Pump | $18.89 | Pet. Tr. Ex. D, 81 |
| 11/09/2018 | Water Pump | $18.22 | Pet. Tr. Ex. D, 81 |
| 11/14/2018 | Chesapeake Waste | $180.00 | Pet. Tr. Ex. D, 53 |
| 12/11/2018 | Water Pump | $18.56 | Pet. Tr. Ex. D, 81 |
| 01/09/2019 | Water Pump | $16.06 | Pet. Tr. Ex. D, 81 |
| 01/14/2019 | Chesapeake Waste | $100.00 | Pet. Tr. Ex. D, 59 |
| 02/12/2019 | Water Pump | $19.36 | Pet. Tr. Ex. D, 81 |
| 03/14/2019 | Water Pump | $18.90 | Pet. Tr. Ex. D, 81 |
| 04/11/2019 | Water Pump | $18.54 | Pet. Tr. Ex. D, 81 |
| 05/07/2019 | Chesapeake Waste | $96.00 | Pet. Tr. Ex. D, 69 |
| 05/10/2019 | Water Pump | $18.56 | Pet. Tr. Ex. D, 81 |
| 06/11/2019 | Water Pump | $18.92 | Pet. Tr. Ex. D, 81 |
| 06/25/2019 | Chesapeake Waste | $96.00 | Pet. Tr. Ex. D, 73 |
| 07/12/2019 | Water Pump | $18.85 | Pet. Tr. Ex. D, 81 |
| 07/18/2019 | Chesapeake Waste | $96.00 | Pet. Tr. Ex. D, 75 |
| 08/12/2019 | Water Pump | $18.82 | Pet. Tr. Ex. D, 81 |
| 09/11/2019 | Water Pump | $18.93 | Pet. Tr. Ex. D, 81 |
| 10/11/2019 | Water Pump | $18.60 | |
| 10/11/2019 | Chesapeake Waste | $192.00 | Pet. Tr. Ex. D, 79 |
| | **TOTAL** | $1,906.23 | |

## TABLE 3: Repairs to the Apartments Property

| Date | Paid To | Amount | Citation |
|---|---|---|---|
| 12/11/2017 | Lowes | $358.97 | Pet. Tr. Ex. D, 12 |
| 12/13/2017 | Lowes | $8.54 | Pet. Tr. Ex. D, 12 |
| 12/21/2017 | Johnson's Sewer & Drain | $350.00 | Pet. Tr. Ex. D, 10, 13 |
| 12/22/2017 | Lowes | $16.11 | Pet. Tr. Ex. D, 12 |
| 12/24/2017 | Lowes | $19.04 | Pet. Tr. Ex. D, 12 |
| 01/01/2018 | East Coast Plumbing Service | $149.00 | Pet. Tr. Ex. D, 18 |
| 01/9/2018 | McMullen Septic Service, Inc. | $250.00 | Pet. Tr. Ex. D, 17, 18 |
| 01/18/2018 | East Coast Plumbing Service | $249.00 | Pet. Tr. Ex. D, 23 |
| 01/18/2018 | McMullen Septic Service | $220.00 | Pet. Tr. Ex. D, 23 |
| 01/20/2018 | Lowes | $15.83 | Pet. Tr. Ex. D, 15 |
| 01/21/2018 | Lowes | $36.07 | Pet. Tr. Ex. D, 15 |
| 01/21/2018 | East Coast Plumbing Service | $149.00 | Pet. Tr. Ex. D, 23 |
| 01/21/2018 | East Coast Plumbing Service | $149.00 | Pet. Tr. Ex. D, 23 |
| 01/25/2018 | Lowes | $14.24 | Pet. Tr. Ex. D, 15 |
| 02/06/2018 | Lowes | $24.17 | Pet. Tr. Ex. D, 19 |
| 02/08/2018 | Lowes | $139.15 | Pet. Tr. Ex. D, 19 |
| 02/10/2018 | Lowes | $57.00 | Pet. Tr. Ex. D, 19 |
| 02/18/2018 | Lowes | $33.71 | Pet. Tr. Ex. D, 19 |
| 03/01/2018 | Penco Corporation | $14.77 | Pet. Tr. Ex. D, 31 |
| 03/05/2018 | Lowes | $83.12 | Pet. Tr. Ex. D, 22 |
| 03/18/2018 | Lowes | $8.72 | Pet. Tr. Ex. D, 22 |

| 04/28/2018 | Grand Rental Station | $28.00 | Pet. Tr. Ex. D, 36 |
|---|---|---|---|
| 05/03/2018 | Penco Corporation | $15.83 | Pet. Tr. Ex. D, 36 |
| 08/12/2018 | Laurel Community Hardware | $3.99 | Pet. Tr. Ex. D, 48 |
| 08/28/2018 | McMullen Septic Service | $280.00 | Pet. Tr. Ex. D, 44 |
| 12/05/2018 | Slaughter Septic | $225.00 | Pet. Tr. Ex. D, 53 |
| 12/07/2018 | East Coast Plumbing Service | $59.00 | Pet. Tr. Ex. D, 54 |
| 12/10/2018 | East Coast Plumbing Service | $704.00 | Pet. Tr. Ex. D, 54 |
| 04/30/2019 | Lowes | $39.16 | Pet. Tr. Ex. D, 62 |
| 05/01/2019 | Lowes | $11.95 | Pet. Tr. Ex. D, 65 |
| 07/17/2019 | Sherwin Williams | $205.38 | Pet. Tr. Ex. D, 71 |
| 07/27/2019 | Lowes | $450.34 | Pet. Tr. Ex. D, 72 |
|  | **TOTAL** | $4,368.09 |  |