NATIONWIDE MUTUAL INSURANCE
COMPANY, Defendant
Below, Appellant,

v.

Lamont STARR and Betty G. Starr,
Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: Nov. 7, 1989.
Decided: May 2, 1990.

---

Robert K. Pearce, Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, for appellant.

Bernard A. VanOgtrop, Cooch & Taylor, Wilmington, for appellees.

Before MOORE and HOLLAND, JJ., and BALICK, Judge (sitting by designation pursuant to Del. Const. art. IV, § 12).

MOORE, Justice.

Once again we are required to resolve a dispute over the terms of an automobile insurance policy. Nationwide Mutual Insurance Company (Nationwide) argues that Lamont and Betty Starr (the Starrs) are not entitled to uninsured motorist benefits because they agreed to release the tortfeasor, Barbara Suiter (Suiter), in exchange for the right to pursue a bad faith settlement claim against Suiter's insurer. The Court of Chancery ruled that the agreement only conditionally released Suiter; thus, Nationwide's right of subrogation was preserved and it suffered no prejudice from the agreement. The trial court held that the Starrs were entitled to receive uninsured motorist benefits and to reform their policy to conform to the statutory amount of coverage prescribed by 18

*Del.C.* § 3902.[1] We agree with that result, but observe that under the express terms of the policy, Nationwide was not entitled to subrogation. Thus, even if the Starrs' agreement had immediately released Suiter, Nationwide would not have been prejudiced. Accordingly, we affirm.

### I.

On November 28, 1979, Lamont Starr was riding in a van owned by Commuter Co–Op and driven by Vanessa Street when the van collided with a car driven by Barbara Suiter. The Starrs subsequently filed personal injury claims against Suiter, Street, and Commuter Co–Op. These claims were tried before a jury in Superior Court on November 6, 1981. The jury exonerated Street and Commuter Co–Op but found Suiter negligent. Judgment was entered against Suiter in favor of the Starrs for $168,500. That judgment has never been paid.

Suiter was insured by Temple Mutual Insurance Company (Temple). Before Suiter's trial, Temple offered to settle the Starrs' claim for $10,000.[2] The Starrs refused. Instead, they reached an agreement[3] with Suiter, which provided:

1. The Debtor [Suiter] *will and does hereby assign* to the Creditors [the Starrs] all of her rights against Temple Mutual Insurance Company ... and authorizes the Creditors to prosecute the said claim against Temple Mutual Insurance Company in the name of the Debtors or the Creditors, as the Creditors see fit.

2. The Creditors *accept this assignment in full payment and satisfaction of said judgment and interest thereon and of their claim against the Debtor.*

3. The Creditors agree that they will prosecute the Debtor's claim against Temple Mutual Insurance Company with reasonable dispatch and that *upon the termination of said litigation, whatever the outcome thereof be, the Creditors will satisfy said judgment* against the Debtor in full.

(Emphases added).

Having obtained Suiter's rights, the Starrs sued Temple for bad faith in handling Suiter's defense and settlement negotiations. They never got to trial. Temple went into liquidation on May 2, 1985, and the Pennsylvania Guarantee Insurance Association (PGIA) advised the Starrs that they must first exhaust coverage under all other policies before PGIA would make any payment on behalf of Temple. The Starrs subsequently initiated this action in the

1. 18 *Del.C.* § 3902(b) currently provides in part:

    Every insurer shall offer to the insured the option to purchase additional coverage for personal injury or death up to a limit of $100,000 per person and $300,000 per accident or $300,000 single limit, but not to exceed the limits for bodily injury liability set forth in the basic policy. Such additional insurance shall include underinsured bodily injury liability coverage.

    Before the statute was amended to its current form, our decisions established that prior versions of the statute similarly obligated insurers to offer a minimum amount of uninsured motorist coverage. *State Farm Mut. Auto. Ins. Co. v. Arms,* Del.Supr., 477 A.2d 1060 (1984). *See also O'Hanlon v. Hartford Acc. & Indem. Co.,* 439 F.Supp. 377 (D.Del.1977), *modified,* 639 F.2d 1019 (3rd Cir.1981). That obligation was triggered whenever there was a basic change in the legal relationship of the parties, such as issuance of a new policy, other than a mere renewal. *Arms,* 477 A.2d at 1065. The failure to offer additional coverage was deemed a continuing offer which could be accepted even after an accident occurred. *Arms,* 477 A.2d at 1064;

    *O'Hanlon v. Hartford Acc. & Indem. Co.,* 522 F.Supp. 332, 334 (D.Del.1981), *aff'd without opinion,* 681 F.2d 806 (3rd Cir.1982) and 681 F.2d 807 (3rd Cir.1982). To facilitate this appeal, the parties have stipulated that Nationwide failed to offer increased coverage before the date of the accident and that from the date of the accident to May 9, 1984, there was at least one change in the policy which could be considered the issuance of a new policy under *Arms.*

2. Temple's liability under Suiter's policy was limited to $15,000 per person and $30,000 per occurrence; however, Lamont Starr was not the only person who suffered damages. One passenger in the van was killed, and another was seriously injured. Temple took the position that no more than $10,000 could be offered to any one of the claimants. The other two claimants accepted Temple's settlement offer.

3. The parties have taken pains to characterize the agreement as either a release or an assignment. We will employ the neutral term "agreement".

Court of Chancery against Nationwide [4] for a declaratory judgment that they were entitled to uninsured motorist benefits and to reform their policy limits to conform to 18 *Del.C.* § 3902.

Nationwide moved for summary judgment, arguing that the Starrs' claim for uninsured motorist benefits should be dismissed because (1) the agreement between the Starrs and Suiter constituted a present release of the Starrs' claim against a tortfeasor, leaving Nationwide without a legal basis for recovery, in violation of the uninsured motorist provisions of the policy; (2) by releasing Suiter, the Starrs waived their right to reform the amount of coverage under the uninsured motorist provisions of their policy; (3) by failing to notify Nationwide of the suit and judgment against Suiter and the execution of the release, the Starrs breached the notice provisions of the policy; and (4) even if the Starrs' claim for uninsured motorist benefits was valid, their reformation action was barred by laches since it was filed almost five years after they obtained the judgment against Suiter and became aware that she was underinsured.

The Court of Chancery rejected all of Nationwide's arguments. With respect to the first two claims, it ruled that the agreement was a release subject to a condition precedent—the termination of litigation against Temple. Since it was not a present release, Nationwide retained the right to subrogation and could not refuse to provide uninsured motorist benefits. As to Nationwide's third claim, the court concluded that Nationwide suffered no prejudice by the Starrs' failure to notify Nationwide of their agreement with Suiter since it was still entitled to subrogation. Finally, it held that the Starrs were not barred by laches from reforming their policy. 548 A.2d 22.

## II.

On appeal, Nationwide raises the same contentions that it presented below. Since the facts are undisputed, our standard of review is whether the trial court erred in formulating or applying legal precepts. *Rohner v. Niemann,* Del.Supr., 380 A.2d 549 (1977). We review such legal holdings *de novo. Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927, 930–31 (1982).

■ The principal issue in this dispute involves a question of contract interpretation. While we agree with the result reached by the trial court, we find it unnecessary to review its determination that the agreement was not a present release of the tortfeasor and did not prejudice Nationwide's alleged right of subrogation. Under the plain language of the insurance contract, Nationwide had no right of subrogation. Thus, it could not have been prejudiced even if the Starrs' agreement constituted an immediate release of the tortfeasor.

The Starrs' contract of insurance with Nationwide contains general and specific provisions. The general provisions address topics such as reporting of accidents, modifying the policy, subrogation, renewal, cancellation, and installment premiums. The specific provisions detail types of insurance coverage including comprehensive, collision, towing and labor, property damage and bodily injury liability, personal injury, non-vehicle property damage, uninsured motorist protection, and comprehensive family liability. After thoroughly reviewing the provisions of the Starrs' policy, we are convinced that neither the general nor the specific provisions of the policy gives Nationwide a right of subrogation.

The general provisions of the policy limit Nationwide's right of subrogation to certain named coverages. The general subrogation provision states: "We [Nationwide] have the right of subrogation under the Physical Damage, Auto Liability, Personal Injury Protection, Damage to Property Other Than a Motor Vehicle, and Comprehensive Family Liability Coverages in this

---

**4.** Initially, the Starrs also sued the insurers of Street and Commuter Co-Op for uninsured motorist benefits. The Court of Chancery dismissed those claims, holding that the Starrs lacked standing to maintain them. The Starrs have not appealed that portion of the Court of Chancery's decision.

policy." Uninsured motorist coverage is conspicuously absent from this list of coverages under which Nationwide has the right of subrogation. None of the other general provisions gives Nationwide the right of subrogation in connection with uninsured motorist coverage.

The specific provision of the policy concerning uninsured motorist coverage similarly does not establish any express right of subrogation in connection with uninsured motorist benefits. The policy provides:

> Under this [uninsured motorist] coverage we will pay all sums for bodily injury and property damage that you or your legal representative are *legally entitled to recover* as damages from the owner or driver of an uninsured motor vehicle.
>
> *To the extent of any payment we make under this coverage,* we are entitled to payment made to the insured by any legally liable party. The insured will hold in trust for us his rights of recovery against such party. The insured will do whatever is proper to secure such rights, and will do nothing to prejudice them. If payment of an uninsured motorist claim arises out of the insolvency of an insurer, we will have right of recovery against the insurer or its receiver, *but not its insured.* We will have the same rights the policyholder of the insolvent insurer would have had.

(Emphases added).

■ The right of subrogation is broad. The general policy provision regarding subrogation gave Nationwide the Starrs' right to sue the tortfeasor. It required the Starrs to "sign such papers, and do whatever else is necessary, to transfer these rights to [Nationwide]." It further obligated the insured to "do nothing to prejudice" Nationwide's right of subrogation. By contrast, Nationwide's rights under the specific uninsured motorist provision of the policy are narrower. The specific provision merely required the Starrs "to hold in trust" their rights of recovery against any legally liable party. The Starrs were obligated to "do whatever is proper to secure such rights" and to "do nothing to prejudice them" but only to the extent of any payment made to the Starrs. Moreover, in case of an insolvent insurer, the policy expressly stated that Nationwide had no right of recovery against the insured (then-uninsured) motorist.

We find the distinctions between the language of the general subrogation provision and the specific uninsured motorist coverage to be significant. Under the general subrogation provision, Nationwide had the right to sue legally liable parties on behalf of the Starrs, but that right did not extend to uninsured motorist coverage. Under the specific uninsured motorist provisions, Nationwide had the right to recover any monies recovered by the Starrs, but it did not have the right to sue on their behalf.[5] Thus, Nationwide had no right under the policy to direct how the Starrs should proceed in litigation. Furthermore, its rights were specifically limited to the extent of its payments. Since Nationwide never paid any uninsured motorist benefits to the Starrs, we find that it had no right to direct how the Starrs should proceed in this case.[6]

Because Nationwide had no right of subrogation for uninsured motorist coverage under the policy, it could not have been prejudiced by the Starrs' agreement with Suiter even if that agreement immediately released Suiter from all liability. Under the express terms of the policy, any obligation on the Starrs to avoid prejudicing Nationwide's rights attached only after Nationwide paid uninsured motorist benefits.

---

**5.** We note, however, that after Nationwide pays the Starrs their benefits, it is entitled under the policy to proceed against both Temple and PGIA.

**6.** Even if Nationwide had paid the Starrs uninsured motorist benefits, the Starrs' actions are totally consistent with their obligations under the policy to "take any necessary action in [their] name to recover for [Nationwide] payments made under this coverage." The Starrs initiated an action and obtained a judgment against Suiter. When she was unable to pay the judgment, they proceeded against her insurer for bad faith settlement. We think it unlikely that the Starrs' actions would have prejudiced Nationwide's contractual rights under these circumstances.

**1088** ▰▰▰▰▰

Since no payment was made, the Starrs could not have violated the terms of the policy or waived their right to recover uninsured motorist benefits.

## III.

▰▰▰ Nationwide also argues that the Starrs breached the notice provisions of the policy by failing to inform the company of their claim against Suiter, the judgment rendered against her, and their subsequent agreement. To prevail on its claim, Nationwide must show both that the policy was breached and that it was prejudiced by the violation of the policy. *State Farm Mut. Auto. Ins. Co. v. Johnson*, Del.Supr., 320 A.2d 345, 346 (1974); *Falcon Steel Co. v. Maryland Cas. Co.*, Del.Super., 366 A.2d 512, 516 (1976). *Cf. Bryant v. Federal Kemper Ins. Co.*, Del.Super., 542 A.2d 347, 349–350 (1988). The Court of Chancery found that the Starrs breached the notice provisions of the policy[7] but that Nationwide was not prejudiced by the breach. In light of our conclusion that Nationwide had no subrogation rights under the uninsured motorist provisions of the policy, we similarly conclude that Nationwide was not prejudiced by the Starrs' failure to inform Nationwide of their action against and later agreement with Suiter.

## IV.

Nationwide's final contention is that the Starrs were barred by laches from reforming their uninsured motorist coverage to conform to the statutory amount prescribed by 18 *Del.C.* § 3902.[8] Its laches claim is premised upon the Starrs' right to reform their contract to obtain additional *underinsured* motorist coverage rather than their right to obtain additional uninsured motorist coverage. Nationwide argues that the Starrs' right to reform their contract to obtain additional underinsured motorist coverage was triggered either on

November 6, 1981, when they obtained a judgment against Suiter in excess of her insurance coverage, or on August 20, 1982, the effective date of the amendment to 18 *Del.C.* § 3902 requiring insurers to offer a minimum amount of underinsured coverage. It asserts that the Court of Chancery should have applied the analogous three year statute of limitations for actions based on a statute, 10 *Del.C.* § 8106, and barred the reformation action. Moreover, Nationwide argues that the Starrs should not be allowed to extend the limitations period indefinitely merely by failing to make a demand to reform the contract.

The Court of Chancery ruled that the Starrs' reformation action was not barred by laches. *Starr v. Nationwide Ins. Co.*, Del.Ch., C.A. No. 8553, 1988, Hartnett, V.C., 1988 WL 127092 (Nov. 21, 1988) (denying motion for reargument). It held that such a result would contradict the legislative intent articulated in *Arms* which imposed on insurers a duty to offer additional coverage whenever there was a change in the basic legal relationship between the insurer and the insured. *Arms*, 477 A.2d at 1064. The court observed that the purpose of the statute was "to fully compensate innocent insureds from financially irresponsible drivers." *Starr*, slip op. at 2. *See also Arms*, 477 A.2d at 1064. Since no offer for increased coverage had been made, the Court of Chancery concluded on grounds of public policy that an offer for additional coverage continued to exist and was not barred by laches.

▰▰▰ The equitable doctrine of laches prevents a plaintiff from exercising unreasonable delay in bringing an action when that delay prejudices a defendant's rights. *Shanik v. White Sewing Mach. Corp.*, Del. Supr., 19 A.2d 831, 837 (1941). In determining whether an action is barred by laches, a court may consider numerous factors including the plaintiff's knowledge of his

---

7. Under both the general conditions and the specific uninsured motorist provisions of the policy, the Starrs were required to notify Nationwide of accidents, occurrences, and losses as soon as practicable.

8. Nationwide conceded that the Starrs' claim for uninsured motorist benefits was not barred by any statute of limitations since it was filed less than two years after Temple went into liquidation. Indeed, the right to reform a contract is an equitable remedy and not subject to statutes of limitations.

rights, the reasons for the delay, and any change of position by the defendant. *Id.* The right to reform a contract is subject to a defense of laches, but the action will not be barred in the absence of some showing that the delay caused the defendant to suffer a detrimental change in position. *Collins v. Burke,* Del.Supr., 418 A.2d 999, 1003 (1980); *Prudential Ins. Co. v. Deane,* Del.Ch., 27 A.2d 365, 368 (1942). *See also generally* 66 Am.Jur.2d *Reformation of Instruments* § 93 (1973).

 The Starrs' right to reform their contract is based on the public policy articulated in *Arms* and derived from the legislative intent of 18 *Del.C.* § 3902. The statute was not effectively amended to include underinsured motorist coverage until August 20, 1982, and *Arms* was not decided until May 1, 1984. Significantly, *Arms* placed the burden on *insurers* to offer additional uninsured and underinsured motorist coverage. The Starrs filed their action on July 21, 1986. We do not find that to be an unreasonable delay in light of *Arms'* determination that insurers rather than insureds are obligated to offer and provide increased coverage.

 Moreover, since Nationwide failed to offer additional coverage to the Starrs before they filed their claim for uninsured motorist benefits, it is difficult to determine what prejudice, if any, Nationwide suffered by the Starrs' delay in asserting their right of reformation. Indeed, under the express terms of the contract of insurance Nationwide was not even entitled to subrogation. Thus, even if we presume that the Starrs knowingly failed to assert their right of reformation in a timely manner, Nationwide has failed to show that it was prejudiced by the delay. The cases cited by Nationwide concern statutes of limitations and are inapposite.

In summary, we find that the Starrs are entitled to seek uninsured motorist benefits from Nationwide and to reform their policy to conform to the statutory coverage amounts prescribed by 18 *Del.C.* § 3902.

Accordingly, the judgment of the Court of Chancery is affirmed.