# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IMO 31-33 AND 55-57 THOMPSON )
CIRCLE, NEWARK, DE, 19711, TAX )
PARCEL NUMBERS 18-021.00-136 ) C.A. No. 2022-0908-SEM
AND 18-021.00-139 )

Post-Trial Report: June 9, 2025
Date Submitted: February 25, 2025

## **FINAL POST-TRIAL REPORT**

Donald L. Gouge, DONALD L. GOUGE, JR., LLC, Wilmington, DE; *Counsel for Petitioner Jennifer Harris*.

William B. Larson, Jr., Irina N. Luzhatsky, MANNING GROSS + MASSENBURG LLP, Wilmington, DE; *Counsel for Respondent Glenn Schmalhofer*.

**MOLINA, Senior Magistrate**

This report resolves the second half of this bifurcated partition proceeding. Petitions for partition are typically resolved through two discreet steps addressing first, entitlement, and second, claims affecting distribution of any proceeds from the partition, if made by sale, or for other monetary relief. Here, step one is complete: more than two years ago now (on May 25, 2023) I granted partition in kind, meaning I physically divided the properties. That division was straightforward. The joint owners each owned 50% of two comparable properties; to split their interests, I granted each owner sole ownership of one property. As one might expect, though, the properties were not identical in value, so I conditioned the split on owelty. Owelty is an equalizing payment whereby the co-owner receiving the higher-valued property in an in-kind partition pays the difference in value to the other party.

By February 2024, the properties were appraised, transferred, and owelty was paid to equalize the in-kind partition. But the parties' disputes did not stop there. Now in "Step Two," the petitioner seeks relief relating to: (1) rental income received or due pre-partition, (2) duties she alleges the respondent owed to her in connection with the properties, and (3) alleged misconduct by the respondent, more generally. These claims were tried late last year.

This post-trial report contains my mixed ruling. The petitioner is entitled to a share of the net rental proceeds received by the respondent pre-partition. She did not wait too long to assert her interest in those proceeds and, as an equal co-owner, she

is entitled to an equal share, less proven reimbursements and contributions from the respondent. In addition to his reasonable claims to offset the rental payment for reimbursements and contributions, the respondent was also permitted, as a co-owner, to reside in one of the properties. He does not owe the petitioner rent related thereto, nor does he owe the petitioner damages for the petitioner's unproven breach-of-fiduciary-duty claim. The parties' relationship was nothing more than any other co-owners. And, although hotly contested, the parties' competing requests were litigated in this action in good faith and the parties should bear their own fees. Costs, however, will be shifted in the petitioner's favor as the prevailing party.

The parties should meet and confer in good faith to resolve the final issue in this action: the amount of money due to the petitioner for rent and costs. A status report should be submitted within sixty days. If the parties are unable to agree, the status report should identify: (1) the costs incurred by the petitioner, with the respondent's objections thereto, if any, and (2) the parties' joint (or competing) proposals for the appointment of a forensic accountant, special magistrate, or trustee to calculate the rental proceeds and prepare a recommendation to the Court (the cost for which will be shared by the parties).

## I.    BACKGROUND[1]

This action revolves around properties located at 31-33 and 55-57 Thompson Circle in Newark, Delaware (the "Properties").[2] Originally the Properties were jointly owned by Jennifer Harris's (the "Petitioner") then-husband John Ryscuck, and Glenn Schmalhofer (the "Respondent" and, together with the Petitioner, the "Parties"). In the early 2000s, the Respondent and Mr. Ryscuck each put 50% down to secure the Properties,[3] intending that the Properties (along with one other property not at issue in this action) would serve as investment properties—"basically just buy, rent, and hold[.]"[4] Mr. Ryscuck and the Respondent operated informally, never executing any written agreements or formalizing the nature of their dealings.[5]

---

[1] The facts in this report reflect my findings based on the record developed at the trial held on November 13, 2024. *See* Docket Item ("D.I.") 76 ("Tr."). I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript are in the form of "[Name] Tr.," referring to the testimony of the identified person. Defined parties are identified with that designation. The Parties' jointly submitted exhibits are cited as "JX__."

At trial I admitted exhibits one through seven and nine through eighteen, though eighteen was provisionally admitted pending the Court's receipt of the jointly proposed exhibit. Tr. 243:13–19. A few weeks later I received a letter containing what was coined "Exhibit 5(c)," D.I. 73, which appears to be the proposed exhibit eighteen. I have, thus, considered it in rendering this post-trial decision, and cite to it as "JX5(c)."

[2] *See* Tr. 7:16–19. The buildings and improvements on the Properties total four residential structures in George Read Village, comprising a duplex on each lot. D.I. 70 ("Pretrial Order") ¶ 4; Petitioner Tr. 9:2–7. Although the transcript refers to "George Reach Village," the development is called "George Read Village."

[3] Respondent Tr. 138:3–12. The Respondent is a real estate investor with decades of experience. *See* Petitioner Tr. 7:22–24; Respondent Tr. 133:15–16, 134:5–13.

[4] Respondent Tr. 139:3–8.

[5] Petitioner Tr. 15:14–16; Respondent Tr. 142:3–6.

The Petitioner was not involved in her husband's dealings with the Respondent;[6] at least not until she and her husband divorced. In or around October 2007, the Family Court decreed the Petitioner's divorce from Mr. Ryscuck.[7] In that decree, the Family Court awarded to the Petitioner Mr. Ryscuck's ownership share of the Properties (and the third, largely irrelevant property), making her a joint owner with the Respondent.[8]

The Parties agree that sometime that same month they met to discuss the Properties. They disagree on some of the minor details of that meeting,[9] but agree on the substance: at that meeting, the Petitioner noted that she "didn't know anything about rental properties" and that the Respondent "would have to teach [her] anything that he wanted [her] to do."[10] And that was no surprise to the Respondent—as he

---

[6] *See* Petitioner Tr. 8:8–11 (Q: "Were you involved at all with these properties prior to your divorce and you obtaining them?" A: "No, I was not.").

[7] *See id.* at 9:20–10:2 (confirming that "a week or so" after the divorce decree was late October 2007).

[8] Pretrial Order ¶ 2. The Respondent bought out the Petitioner's ownership in the third property years ago, Respondent Tr. 139:9–140:3, leaving the two tied only by their joint ownership of the Properties. Pretrial Order ¶¶ 1–2. According to the Petitioner, the Respondent failed to respond to a buyout proposal for the Properties. Petitioner Tr. 15:22–16:2. The Respondent does not recall receiving any such offer. Respondent Tr. 176:17–21.

[9] From the Petitioner's vantage point, her friend "Mona" (whose surname I could not locate in the record and through use of her first name intend to suggest no disrespect or familiarity), the romantic partner to Kenny Smigelski—who handled various maintenance aspects for the Respondent—was present. Petitioner Tr. 9:17–10:10, 12:8–12. According to the Respondent, the Petitioner's then-boyfriend, Freeman Dordell, was there. Respondent Tr. 142:11–144:8. These minor differences are immaterial.

[10] Petitioner Tr. 10:13–18.

explained it, when Mr. Ryscuck was involved with the Properties, "to the best of [the Respondent's] knowledge, [the Petitioner] didn't do any work on the [P]ropert[ies]."[11] So, he "kind of figured going forward that's kind of how it was going to be."[12]

Although the Parties agree on the Petitioner's prior lack of involvement and overall lack of experience with rental properties, they disagree about how those deficits would be addressed, if at all.[13] Any plan of attack aside, the Parties agree that the Petitioner never became actively involved with renting the Properties or the maintenance that came with it.[14] That was all—as the Parties agree—handled by the Respondent.[15]

---

[11] Respondent Tr. 144:3–7.

[12] *Id.* at 144:7–8. And in fact, it was—between 2007 and 2023, the Petitioner never even "set eyes" on the Properties, despite living only twenty or thirty minutes from them. Petitioner Tr. 39:10–17.

[13] As previously noted, according to the Petitioner, she told the Respondent that although she was willing to help, he would need to teach her anything he wanted her to do, an offer that went unclaimed. Petitioner Tr. at 10:19–11:1. The Respondent's recollection differs, though it seems a bit contrary at times. *Contrast, e.g.*, Respondent Tr. 145:13–22 (noting that in the 2013 or 2014 tax year, he "indicated to [the Petitioner] that this was just too much work for [him] to do and [he] did need her help"), *with id.* at 183:8–15 (explaining that he never asked the Petitioner for help in writing because he "knew that it wasn't going to happen" and that it "was just a given going in"). Whether the Petitioner's assistance was offered or requested, the record is clear that she never ended up doing so.

[14] Respondent Tr. at 144:9–11; Petitioner Tr. 30:8–17.

[15] Pretrial Order ¶ 15.

Anyone reviewing the Respondent's conduct, with the benefit of hindsight, could find fault with his lax record keeping. At various times, the Respondent footed utility bills or covered maintenance expenses and repairs without documentation or reimbursement.[16] He did it all in connection with the Properties, taking on general tasks, turning over the units for incoming renters, and handling bills, leases, and other paperwork.[17] He also took the lead on marketing the Properties, locating potential tenants, and either addressing maintenance and cleaning needs himself, or contracting them out.[18] As far as he could recall, the Respondent would not typically pay himself for his services.[19] He also did not track his own work on the Properties by the hour, nor did he assign it a billing rate—if he did, it "would have been a big bill."[20]

---

[16] Respondent Tr. 175:16–24. This includes, for example, the time the Respondent built a garage at the 31-33 property, both because the garage was "at the end of its useful life[,]" and because the City of Newark pushed the issue. *See* Petitioner Tr. 12:20–23; Respondent Tr. 153:11–154:12. The Respondent himself built the garage, charging roughly $4,000 to $5,000 for materials. Respondent Tr. 197:5–198:2. In addition to the garage, most of the units underwent interior renovations. *Id.* at 153:2–10. Such renovations included running cable through walls, new furnaces, air conditioners, flooring, cabinets, carpeting, and washer/dryers. *Id.* at 154:13–155:16. Again, most of the costs came from the joint account. *Id.* at 155:20–23.

[17] Respondent Tr. at 149:18–150:9, 151:24–152:3.

[18] *Id.* at 150:10–151:10.

[19] *Id.* at 151:20–23. He typically did hands-on work using his own tools, equipment, trucks, and gasoline, and did not pay himself other than trying to reimburse. *Id.* at 156:3–8.

[20] *Id.* at 156:9–13.

The Respondent did, however, cover expenses related to the Property and pay third-party hires by check from a joint account.[21] The account named both the Petitioner and the Respondent, the former of whom was added shortly after she joined the mix.[22]

The joint account was funded by rental income from the Properties. During the Parties' joint ownership, per the Respondent, although they were not at full occupancy, the Properties were usually occupied, especially in the earlier years.[23] This was thanks to the Respondent's efforts. Those occupants paid rent, with the exception of the Respondent, who lived in the 57 property himself for roughly a year-and-a-half.[24]

For all other units, rent was paid to the Respondent, which he logged in and then deposited into the joint account.[25] Although he is not certain, the Respondent suspects that at some point he received cash rental payments.[26] The Respondent tracked expenses related to the Properties with a checkbook and through credit cards

---

[21] *Id.* at 151:11–19.

[22] *Id.* at 159:9–22.

[23] *See id.* at 166:24–167:19.

[24] *See id.* at 168:2–6 (estimating that he lived at 57 Thompson Circle for "about a year and a half, plus or minus").

[25] *Id.* at 156:14–20, 157:10–12.

[26] *Id.* at 207:7–9; *see id.* at 207:13–16 (answering "[u]sually no" when asked if he received cash payments from tenants).

7

paid online from the joint account.[27] But balancing the accounts never got "sophisticated[;]"[28] there was "[n]ot really" an accountant involved, no balance or profits and losses sheets, and the Respondent relied on the actual bank account statements indicating the money being deposited into and withdrawn from the joint bank account.[29] Further, although the Respondent explained that he used property management software in the past for other rental properties, he could not recall if he used such programming for the Properties.[30] As such, the Respondent posits that the best showing of money flow is the joint account.[31]

The Petitioner was not involved in these day-to-day or month-to-month decisions. But she did communicate with the Respondent regarding tax-related information for the Properties.[32] And the Respondent furnished the Petitioner with

---

[27] *Id.* at 156:21–157:1.

[28] *Id.* at 157:17–18.

[29] *Id.* at 157:2–23.

[30] *Id.* at 220:3–19. Without a formal management system, inevitably a few things slipped between the cracks. *See, e.g.*, *id.* at 174:1–175:15. The trial record confirms as much but I decline to infer the Respondent acted with ill intent, instead recognizing that a few mishaps over the course of nearly two decades are (unfortunately) bound to happen.

[31] *Id.* at 157:24–158:9.

[32] Interestingly, the Petitioner's personal tax returns from 2007 to 2013 do not reflect her interest in the Properties, Petitioner Tr. 32:9–17, though the Respondent avers he furnished her with the necessary information. Respondent Tr. 145:7–8. And although the Petitioner posits that she received the requested information in 2014 to complete her 2013 taxes, she says has not received anything since. Petitioner Tr. 18:1–7.

According to the Petitioner, she would call the Respondent roughly one month before filings were due to request information for tax purposes, which she received verbally. *Id.* at 11:5–17. Despite this representation, she also testified that the two have not

one profit draw from the joint account on March 7, 2010 for $4,000, also writing himself a check for the same amount.[33]

Over time, the Parties' contact has remained minimal. Indeed, when asked when her last contact with the Respondent was, the Petitioner estimated it was around 2014,[34] though, as noted, she did seek tax information in early 2024.[35] And the Respondent agrees—before this lawsuit, he could most recently recall possibly

---

been in contact since 2014. *Id.* at 13:23–14:3. Her testimony is similarly unclear regarding which years she contacted the Respondent for such information. When generally asked what would happen at tax season, the Petitioner responded that she "would call [the Respondent] approximately a month before tax season to request information that [she] needed for [her] tax returns" and that sometimes [she] would get him" but "sometimes [she] would] have to leave a message." *Id.* at 11:5–9. She avers that when they *did* speak, "he didn't necessarily have the information ready, so [she] would have to follow up and call him to get the information[,]" though he sometimes told her to "just file an extension." *Id.* at 11:10–14. At the very least, she contacted him for a few years after 2008, *id.* at 31:22–32:1, and for a final time in early 2024. *Id.* at 32:6–8.

Although under other circumstances I may find that these seeming inconsistencies weigh against the Petitioner's credibility, because such conversations both would have occurred over a decade ago and do not move the needle on my analysis, I deem them largely unremarkable. Plus, the Respondent recalls, at least somewhat vaguely, potential communications regarding tax information. Respondent Tr. 145:23–146:7.

[33] Petitioner Tr. 11:21–12:7, 12:13–15. As she readily admits, she did not receive any further draws, nor did she ask the Respondent for any. *Id.* at 12:16–19. But she did not need the Respondent's permission—she also had access to the joint account. *See, e.g.*, JX5(a) at JTHarris-Schmalhofer0043 (account statement identifying both the Petitioner and Respondent); Petitioner Tr. 31:8–21 (confirming same); JX5(a) at JTHarris-Schmalhofer0044 (check images reflecting both the Petitioner's and Respondent's names in the top left corner). Although the Parties again diverge in position as to whether the Petitioner had a checkbook, *contrast, e.g.*, Petitioner Tr. 13:20–22, *with* Respondent Tr. 181:19–182:7, such is largely irrelevant. The Respondent had access to the joint account.

[34] Petitioner Tr. 13:23–14:3.

[35] *Id.* at 32:6–8.

communicating about tax information in 2013 or 2014, and *maybe* thereafter.[36] Only through this litigation have the Parties had direct, consistent contact.

## II. PROCEDURAL POSTURE

The Petitioner initiated this action for partition on October 7, 2022.[37] I issued a rule to show cause why the Properties should not be partitioned and held a hearing on November 22, 2022, at which point I decided partition was appropriate and requested briefing to address whether owelty may be warranted.[38] A couple of months later I bifurcated this action, directing that the partition mechanics would be addressed before addressing claims for reimbursement, contributions, and the like.[39] In May of 2023, having decided the Properties should be partitioned in kind, I determined that owelty was similarly appropriate.[40]

After resolving a brief discovery dispute and requiring the Respondent to produce unredacted tax returns subject to the execution of a confidentiality agreement,[41] the Petitioner amended her petition and added a claim for breach of fiduciary duties.[42] The Parties advised on February 15, 2024 that the in-kind partition

---

[36] Respondent Tr. 145:9–146:3.

[37] D.I. 1.

[38] *See* D.I. 12.

[39] D.I. 18.

[40] D.I. 30.

[41] D.I. 48.

[42] D.I. 60.

was complete and owelty paid, allowing us to move to Step Two of these proceedings.[43] I held a one-day trial on November 13, 2024,[44] and post-trial briefing was complete on February 25, 2025, at which point I took this matter under advisement.[45]

## III. ANALYSIS

Now in Step Two, the Petitioner seeks to recover her share of the rental income collected (as well as the income she says should have been collected) by the Respondent spanning seventeen years. She also argues that the Respondent owed to her—and breached—fiduciary duties in connection with his management of the Properties, and therefore seeks monetary damages. The Petitioner then asks that her attorneys' fees be shifted to the Respondent for bad faith litigation.

I begin by quickly disposing of the Respondent's affirmative defense of laches, before addressing the monies I find the Petitioner should receive. I further explain that, because the Respondent owed no fiduciary duties to the Petitioner, none have been breached. And without proof that the Respondent acted in bad faith, each side should bear its own fees. I do, however, find that costs should be shifted to the Petitioner as the prevailing party.

---

[43] D.I. 40.

[44] D.I. 72; D.I. 76.

[45] D.I. 80.

## A. The Petitioner's claims are not barred by the doctrine of laches.

The Respondent argues that the Petitioner's claims are barred by laches. "The equitable doctrine of laches prevents a [petitioner] from exercising unreasonable delay in bringing an action when that delay prejudices a [respondent's] rights."[46] "A finding of laches generally requires the presence of three factors: the claimant's knowledge of the claim, unreasonable delay in bringing the claim, and resulting prejudice to the [respondent]."[47] "The party asserting the laches defense bears the burden of proving each element[,]"[48] and must do so by a preponderance of the evidence.[49] When such elements are met, "[l]aches bars an action in equity[.]"[50] "In determining whether an action is barred by laches, a court may consider numerous factors including the [petitioner's] knowledge of his rights, the reasons for the delay,

---

[46] *Deputy v. Deputy*, 2020 WL 1018554, at *47 (Del. Ch. Mar. 2, 2020) (quoting *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088 (Del. 1990)).

[47] *Id.* (quoting *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016)).

[48] *Id.*

[49] *E.g.*, *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *48 n.478 (Del. Ch. Feb. 12, 2018), *rev'd in part on other grounds sub nom.*, *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 204 A.3d 482 (Del. 2019). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Id.* (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[50] *Deputy*, 2020 WL 1018554, at *47 (quoting *Whittington v. Dragon Gp., L.L.C.,* 991 A.2d 1, 8 (Del. 2009)).

and any change of position by the [respondent]."[51] "The length of the delay is less important than the reasons for it."[52] At bottom, the doctrine of laches "focuses on whether an unreasonable delay in asserting the claim has unfairly prejudiced the [respondent]."[53]

Initially, I can appreciate the Respondent's concerns about delay. The Petitioner and the Respondent have co-owned the Properties since 2007. Other than a distribution in 2010, the Petitioner did not receive any share of the rental income from the Respondent. It was not until late 2022, when this action was filed, that the Petitioner cried foul with the arrangement. This sequence reflects delay, and arguably undue delay. But what the Respondent has not established is prejudice.

The Respondent cannot establish by a preponderance of the evidence that he would be prejudiced by allowing the Petitioner's claims to be heard now. Sure, the delay makes clearing up the rental income/profit situation messier, but this situation is just as much a product of the Respondent's actions as it is the Petitioner's. The Petitioner, although uninvolved in the day-to-day or month-to-month operations, did communicate with the Respondent regarding her ownership interests for tax

---

[51] *Id.* (quoting *Starr*, 575 A.2d at 1088–89).

[52] *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 295 (Del. Ch. Mar. 26, 2015) (quoting *IAC/InterActiveCorp v. O'Brien,* 26 A.3d 174, 177 (Del. 2011)).

[53] *de Adler v. Upper N.Y. Inv. Co.*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013); *see also Whittington,* 991 A.2d at 8 ("In some circumstances even a long delay might be excused.").

purposes, reflecting her continued assertion of her rights as an owner. The Respondent recognized as much with the 2010 distribution. It would have been both unreasonable and untoward for the Respondent to assume that the Petitioner was waiving her claim to a fair share of the rental income because she did not affirmatively request that share sooner than this action, and in connection with a split of the joint interests. Such is especially true where, per the Respondent, the Petitioner had equal access to the joint account and could have taken her share at any time. Under these circumstances, the Parties bear equal responsibility for the delayed review of their interests, and the Respondent has not demonstrated prejudice sufficient to prove laches.[54] The Respondent's laches defense fails.

B. **The Petitioner is entitled to her share of the rent the Respondent received, subject to certain reimbursements and contributions.**

The Petitioner seeks to recover her share of the rental income received plus income she contends should have been received. I find the latter request overreaching and that the former, while appropriate, should be limited to account for the Respondent's reimbursements and contributions.

---

[54] Because laches fails on prejudice, I need not rule on the Respondent's request to adopt an analogous three-year statute of limitations. D.I. 79 at 24–26.

14

### 1. The Petitioner should only be entitled to rent received.

Co-tenants are entitled to share equally in rental proceeds.[55] To that end, a cotenant is entitled to an accounting for rents received from third parties for use of the commonly owned property.[56] They are then entitled to their proportionate share, less contributions or expenses.[57] The Respondent has to rebut these basic propositions or otherwise justify why rental proceeds should not be shared. He failed to do so.

The Petitioner's request for more, however, is denied. The Petitioner asks that the Respondent also be required to pay the Petitioner her share of rent that could have, and in her view, should have been collected, had the units been rented at fair market value during the entirety of their joint ownership. To recover at this level, the Petitioner argues that the Respondent owed to her a duty to keep the Properties rented and income producing. I disagree that any such duty was owed, and as such, no further recovery is warranted.

This request springs from the looks of a breach-of-fiduciary-duty claim. To prove breach of fiduciary duty, the complaining party must prove by a preponderance

---

[55] *See Green v. Shockley*, 2022 WL 275975, at *6 (Del. Ch. Jan. 31, 2022) (explaining that each co-tenant was entitled to "one half of the total [rental] revenue").

[56] *Id.* at *4 (citing *Mougianis v. Embassy Realty Co.*, 112 A.2d 844, 847 (Del. Ch. 1955)).

[57] *See id.* at *6 (explaining that each co-tenant's share was subject to "contributions or expenses paid").

of the evidence that: (1) a duty exists, and (2) that duty was breached.[58] The Petitioner fails on (1).

The Petitioner appears to argue that she and the Respondent were business partners. But neither Mr. Ryscuck and the Respondent, nor the Petitioner and the Respondent, were engaged in a partnership. In relevant part, under 6 *Del. C.* § 15-202, a partnership is formed by the association of two or more persons "to carry on as co-owners a business for profit[.]" But joint property ownership in and of itself does not establish a partnership, "even if the co-owners share profits made by the use of the property."[59] A partnership requires more; it requires individuals intentionally and expressly, either in writing or through conduct, engaging in a shared enterprise.[60] "The evidence the Court may consider to determine whether such an obligation existed includes the language of any agreement between the parties, and the parties' acts, dealings, conduct, and admissions."[61] When, like here

---

[58] *Gunderson v. Trade Desk, Inc.*, 326 A.3d 1264, 1272 n.25 (Del. Ch. Nov. 6, 2024), *as corrected*, (Del. Ch. Nov. 8, 2024).

[59] 6 *Del. C.* § 15-202(c)(1).

[60] *See Ramone v. Lang*, 2006 WL 905347, at *12 (Del. Ch. Apr. 3, 2006) ("Under 6 *Del. C.* § 15-202(a), a partnership is formed through the association of two or more persons to carry on as co-owners a business for profit, whether or not the persons intend to form a partnership.") (citation modified).

[61] *New Stuart Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *19 (Del. Ch. Sept. 4, 2024) (quoting *Grunstein v. Silva*, 2011 WL 378782, at *9 (Del. Ch. Jan. 31, 2011)).

"there is no written agreement, I base my decisions solely on the credibility of the Parties."[62]

Here, the Parties agree that they were estranged and communicated infrequently. When they began their joint ownership, the Parties did not reach any understanding as to how the Properties would be managed or leveraged to produce income for the co-owners. There was no plan, goal, or shared enterprise, either expressly or implicitly through the Parties' dealings. The record simply does not support that there was any reasonable understanding that the Parties were engaged in something more than co-ownership. And as a co-owner, the Respondent had no duty to keep the Properties rented and income generating. Thus, the Petitioner's request for rent that "could have" been collected is denied.[63]

### 2. The Petitioner's share is subject to certain reimbursements and contributions.

The Petitioner's recovery must, however, properly account for her share of the maintenance, repairs, and expenses associated with the Properties. Co-tenants are expected to share in property-related expenses.[64] "A tenant in common who pays the

---

[62] *Jackson v. Nocks*, 2018 WL 1935961, at *5 (Del. Ch. Apr. 24, 2018).

[63] *See also Green*, 2022 WL 275975, at *6 (concluding that it "would be inequitable" to presume properties were "fully rented and all rents due were collected during that period"). It is for similar reasons that I decline to give weight to the testimony of Ms. Christina Quinn, who was introduced to opine on the market rents of the Properties. *See generally* Tr. 40:11–56:11 (Ms. Quinn's trial testimony); JX3 (Ms. Quinn's analysis).

[64] *See Est. of Weber v. Weber*, 2014 WL 589714, at *5 (Del. Ch. Feb. 17, 2014) ("Delaware law requires cotenants to share equally the taxes imposed on jointly-owned property and

17

debts or obligations for the benefit of joint property is entitled to contribution from the other tenant in common for his proportionate part of the amount paid."[65] But the burden falls on the Respondent—the cotenant who covered such expenses—to prove that necessary expenses were incurred at specific, rather than speculative, amounts.[66]

The time for such proof was our trial. At trial, the Respondent testified that he made payments from both the joint bank account, as well as from his own pocket, toward things like taxes, utilities, mortgages, maintenance, and repairs.[67] Although most of his testimony was him explaining away changes that appeared improper or implausible,[68] my team was able to piece together the substantiated contributions and expenses through a painstaking review of the bank statements and other exhibits, which we then cross-checked against the trial testimony and briefing. Altogether, the Respondent substantiated $249,079.13 in allocable contributions and

---

insurance costs associated with the property[.]"); *see also Green*, 2022 WL 275975, at *8 (explaining that "the Court may, as a matter of equity, compensate a co-tenant proportionally . . . for improvements made by one co-tenant" when such improvements have enhanced the value of the property).

[65] *In re Holmes*, 2000 WL 1800127, at *4 (Del. Ch. Nov. 21, 2000), *aff'd,* 787 A.2d 100 (Del. 2001).

[66] *Green*, 2022 WL 275975 at *8 n.71.

[67] *See, e.g.*, Respondent Tr. 163:13–21; *id.* at 175:16–24.

[68] *E.g.*, Respondent Tr. 173:22–175:15.

reimbursements, which went toward the Properties. That amount comprises the following.[69]

- **Utilities.** The Respondent submitted documentation supporting a total of $37,687.12 toward permissible utilities for the Properties: (1) $7,179.04 for 31 Thompson Circle;[70] (2) $20,256.97 for 33 Thompson Circle;[71] (3) $6,716.88 for 55 Thompson Circle;[72] and (4) $3,534.23 for 57 Thompson Circle.[73]
- **Maintenance and Miscellaneous Expenses.** The Respondent submitted documentation supporting a total of $30,377.98 for maintenance and other permissible miscellaneous expenses for the Properties.[74] Such include, for example, Home Depot, Lowes, checks written out for maintenance, and plumbing.

---

[69] To calculate these figures, I credited only the expenses listed as representing payments made during the period of co-tenancy. Duplicates, where applicable, were excluded.

[70] *See* JX17 at 1086, 1105–06, 1109–11.

[71] *See id.* at 1127–34.

[72] *See* JX9 at 631; JX17 at 1137, 1142–55.

[73] *See* JX9 at 625–626, 628, 630, 632–35; JX17 at 1158–62, 1171, 1173. This figure excludes utilities incurred while the Respondent estimated he lived at the property, *i.e.*, 2014 through 2016. The Petitioner, as the out-of-possession cotenant, is not required to contribute to the living expenses for the in-possession cotenant. *See In re Turulski*, 1993 WL 18767, at \*5 (Del. Ch. Jan. 21, 1993) (explaining maintenance and utility payments by a cotenant in possession are expenses incurred for the benefit of the cotenant "who would have had to pay them in any event").

[74] *See* JX4 at 16, 19, 22, 25, 30; JX5(a) at 42, 44, 47, 49, 51, 55, 57, 61, 63, 65, 67, 69, 71, 73, 77, 79, 81, 83, 88–90, 92, 96, 114, 129, 146, 148–50; JX5(c) at 15 of 24, 1 of 25, 11 of 25. Purported expenses disproven at trial were not considered.

Over the Petitioner's objection, I have included the garage-related expenses. The improvement certainly benefitted the property. That the Respondent used it to store tools that were also used for other properties is of no moment.

Furthermore, although the Respondent testified credibly that he put hours of sweat equity into the Properties, he offered no documentation in support thereof. Without another formula to use or any sort of proposition or recommendation from the Respondent to utilize, I am unable to put any sort of number or value to his efforts.

- **Mortgages.** The Respondent submitted documentation supporting a total of $181,014.03 paid toward the Properties' mortgages and affiliated expenses.[75]

Because the Petitioner and Respondent should have shared equally in these expenses (either out of their own pockets, or out of the joint account), the split comes out to $124,539.57 per co-owner. This amount should be subtracted from the Petitioner's 50% share of the rental income, which will be determined in a subsequent order by stipulation or with the assistance of a court-appointed neutral.

### 3. The Petitioner should not be awarded prejudgment interest.[76]

The Petitioner asks for an award of prejudgment interest on the rental income owed to her. She contends, citing to case law, that such interest "is awarded as a matter of right and computed from the day payment is due."[77] But "[p]rejudgment interest serves two purposes: first, it compensates the [petitioner] for the loss of the use of his or her money; and, second, it forces the [respondent] to relinquish any

---

[75] *See* JX5(b) at 241–46, 248–49, 251–67, 269, 271, 273, 275, 277, 279, 281, 283, 285, 287, 289, 291–95, 297, 299, 301, 303, 305, 307, 321, 323, 325, 329, 331, 333, 335, 337, 339, 341, 343, 345, 347, 349, 351, 353, 355, 357, 359, 361, 363, 365, 367, 369, 370–71, 373–79, 381, 383; JX5(c) at 1–2 of 24, 4 of 24, 1 of 25, 2 of 25, 4 of 25, 6 of 25, 8 of 25, 11 of 25, 14 of 25, 16 of 25, 19 of 25, 22 of 25, 24 of 25.

[76] But "an award of post-judgment interest in Delaware 'is a right belonging to the prevailing [party] and is not dependent upon the trial court's discretion.'" *Winklevoss Cap. Fund, LLC v. Shaw*, 2024 WL 3888757, at *22 (Del. Ch. Aug. 21, 2024) (quoting *Wilm. Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000)). Thus, such is appropriate here.

[77] D.I. 77 at 19 (citing *Paul Elton, LLC v. Rommel Del., LLC*, 2024 WL 4950034, at *8 (Del. Ch. Dec. 3, 2024)).

benefit that it has received by retaining the [petitioner's] money in the interim."[78] Further, the Court "has broad discretion to establish fair terms for an award of interest" and, "[a]mong other things, . . . can reduce an award of prejudgment interest for inordinate or deliberate delay that is the fault or responsibility of a [petitioner][.]"[79]

Prejudgment interest is not appropriate given the Petitioner's substantial delay in requesting her share of the rental income. With such delay, there is little need to compensate the Petitioner for a situation of her own making. She could have (and arguably should have) maintained better involvement both with the Properties, and in communicating with the Respondent more generally. I find it would be inequitable to award her any prejudgment interest, and her request should be denied.

### C. The Petitioner is not entitled to anything for the Respondent's personal use of 57 Thompson Circle.

The Petitioner also cries foul with the Respondent's personal use of the 57 Thomspon Circle property and asks that he be required to pay rent. Under Delaware law, however, "[a] cotenant is generally entitled to make personal use of property

---

[78] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 316 A.3d 359, 406 (Del. Ch. 2024) (quoting *Brandywine Smyrna, Inc. v. Millenium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011)).

[79] *Columbia Pipeline*, 316 A.3d at 406–07.

held in common and is not accountable for such use in the absence of ouster."[80] Ouster requires more than sole possession and is an affirmative bar or expulsion of the tenant not in possession from the property—one party must have been excluded from the property by the other co-owner.[81] Such may include one party's denouncement of the other's ownership rights, or if they otherwise purport to be a sole owner or deny access to the property.[82]

The Respondent did not oust the Petitioner. True, he resided in one of the units for approximately a year and a half.[83] And I expect during that time he had personal locks and other protections, as one does to guard their place of residence. But, as the Petitioner readily concedes, she was not even aware of his residence.[84] His personal use of the unit was not to her exclusion, and she was not barred, in any way, from exercising her interests in the Properties. There was no ouster, and the Respondent does not owe any rent for his use of his own property.[85]

---

[80] *In re Gedling*, 2000 WL 567879 at *7 (Del. Ch. Feb. 29, 2000) (citation and quotation marks omitted).

[81] *See Holmes,* 2000 WL 1800127, at *4 n.8 (finding no ouster when the moving party was barred from entering the property by an order of the Family Court and not the actions of the co-tenant in possession).

[82] *See Smith v. Lemp*, 63 A.2d 169, 170 ("An ouster of one co-tenant by another can, of course, be shown under some circumstances indicating a clear denial of the co-tenant's rights.") (collecting cases).

[83] Respondent Tr. 168:2–6.

[84] Petitioner Tr. 20:14–20.

[85] I have, however, as reflected above, required the Respondent to cover his own utilities for his in-residence period.

**D.    The Parties were not in a fiduciary relationship, and thus the Respondent did not owe or breach any fiduciary duties.**

The Petitioner argues that the Respondent owed to her, and breached, fiduciary duties regarding the Properties. I disagree. As addressed above, the Parties were not engaged in a joint enterprise and had no cognizable partnership. Nor has the Petitioner proven a confidential relationship through which the Respondent owed her fiduciary duties.

"In some circumstances, a joint tenancy may come with fiduciary duties owed by one joint tenant to the other."[86] But those limited circumstances "typically involve impairment of one tenant by age, dependency, health issues, and the like."[87] This Court has also recognized duties which attach in relationships "predicated on particular confidence or reliance[.]"[88] Those confidential relationships may be established where "circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed."[89]

The Petitioner argues that the Parties were in a confidential relationship because the Respondent exercised sole control over the management of the

---

[86] *Mack v. Mack*, 2014 WL 6734856, at *2 n.5 (Del. Ch. Nov. 28, 2014).

[87] *Id.*

[88] *Mitchell v. Reynolds*, 2009 WL 132881, at *9 (Del. Ch. Jan. 6, 2009), *as revised* (Del. Ch. Jan. 7, 2009).

[89] *Id.* (quoting *In re Wiltbank*, 2005 WL 281075, at *6 (Del. Ch. Oct. 18, 2005)).

23

Properties, in the Petitioner's view refusing to allow her any role, access, or insight, and, instead, using the Properties and proceeds therefrom as his sole property. These litigation-induced arguments are flimsy at best. The Respondent never affirmatively barred the Petitioner from participation, nor refused her funds to which she was entitled. Rather, the Petitioner herself failed to engage and participate and, it appears, the Respondent was fine to continue solo. This lack of engagement and continuance of the status quo is not sufficient to find that either side acted in a fiduciary capacity and owed duties to the other. The record does not support such a finding and the Petitioner's breach-of-fiduciary-duty claim should be denied.

### E. Each side should bear its own fees under the American Rule, but the Petitioner is entitled to costs as the prevailing party.

The Petitioner asserts that attorneys' fees should be shifted in her favor under the bad faith exception to the American Rule. I find no evidence of bad faith and thus decline to shift fees. But because the Petitioner is the "prevailing party" in this matter, costs should be shifted in her favor.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[90] But under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing

---

[90] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

party unless the Court otherwise directs." Here, although I find the Petitioner has failed to prove an exception to the American Rule, she is the "prevailing party."

The Petitioner argues that, because of the Respondent's earlier resistance to disclosing facts relevant to his failure to file tax returns, litigation was unnecessarily delayed. And so, says the Petitioner, her plans were derailed, and she was forced to file a motion to compel earlier in this litigation. As a result, she asks that I shift the fees and costs affiliated with the motion to compel, as well as "increased costs" incurred in connection with the Petitioner's expert report.

Although I acknowledge that the Petitioner is correct in that she ultimately needed to file a motion to compel to obtain the referenced records, I have already ruled on her fee request in connection therewith.[91] Under Court of Chancery Rule 37(a)(4), I denied the request to shift fees, and explained that the Respondent's privacy concerns could be adequately quelled through a confidentiality order (which the Parties ultimately entered into). I will not reconsider that ruling under the bad faith angle.

Moreso, I disagree with the Petitioner that the Respondent has acted with the glaringly egregious conduct necessary to shift fees under the bad faith exception. This action was heavily litigated over several years, but both parties appear to have

---

[91] D.I. 48.

engaged meaningfully and in good faith, working diligently to bring this matter to a close. They should each bear their own attorneys' fees.

Under Rule 54(d), costs will be shifted in favor of the prevailing party as a matter of course. This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main issue or on *most* of her claims."[92] The Petitioner has done so; she successfully prosecuted her case in nearly every respect, and is entitled to much of her relief sought. As the prevailing party, costs should be shifted in her favor.

## IV.   CONCLUSION

For the reasons detailed above, the Petitioner is entitled to a share of the net rental proceeds received by the Respondent before the Properties were partitioned, plus post-judgment interest. The Petitioner's claims are not barred by laches and, as an equal co-owner, she is entitled to half of the rental income, less what should have been her 50% share of proven reimbursements and contributions from the Respondent ($124,539.57). Given the Parties' relationship solely as co-tenants, no fiduciary duties were owed, and thus, none were breached. And because the competing requests were litigated in this action in good faith, the Parties should bear

---

[92] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

their own fees, though costs will be shifted in the Petitioner's favor as the prevailing party.

Because the record is not abundantly clear as to how much rent the Respondent actually collected, the parties shall first meet and confer in good faith to resolve the amount of money due to the Petitioner for rent and costs. A status report should be submitted within sixty days, and, if the parties are unable to agree, the status report should identify: (1) the costs incurred by the Petitioner, with the Respondent's objections thereto, if any, and (2) the Parties' joint (or competing) proposals for the appointment of a forensic accountant, special magistrate, or trustee to calculate the rental proceeds and prepare a recommendation to the Court (the cost for which will be shared by the parties).

This report is not final for exceptions purposes; a final report will be issued on the amount due to the Petitioner, at which time exceptions to this report may be taken under Court of Chancery Rule 144.

Respectfully submitted,

*/s/ Selena E. Molina*
Senior Magistrate in Chancery

27